On February 9, 2012, Mignone met with Function Unit Manager Paden and Lieutenant Penland. At the meeting, Mignone was asked to agree to continue working with Fagan. She refused.
On February 16, 2012, Mignone was transferred out of Unit 6.[1] Over the following several months, she worked at housing units all over the facility, until she was placed in Unit 10 in Fall 2012. The explanation Mignone received at the time of her transfer was that inmates had made a death threat against her. According to Mignone, she was told that a "kite" (or note)
*30 with a threat had been found, along with a shank. Although Mignone requested to see the items, she was not shown either a kite or a shank, and was later told by Department supervisors that the threat was verbal, not written. Officer Jani Holt conducted an internal investigation into the threat, and issued a report on April 20, 2012. Holt reported that she "sincerely doubt[ed]" that "an actual 'hit' [had been] placed on COI J. Mignone." Holt's report stated that Mignone "thinks it is all a ploy to get her out of six (6) house and I would agree with that completely."
When Mignone asked about the status of her request to be transferred back to Unit 6 in May 2012, she was informed by the Warden that the investigation into the death threat had not been completed, and that her request to return to Housing Unit 6 would be reevaluated after the investigation concluded. Despite the Warden's claim that the internal investigation of the threat was ongoing, Holt's investigative report had been sent to the Warden weeks earlier. Moreover, on May 23, 2012, the Warden's clerical assistant sent an email stating that "the administrative inquiry where the offender made a threat is complete. However, the matter between [Mignone] and Officer Fagan is not so they have not returned her to her post." The Warden acknowledged that, after completion of the investigation of the death threat, Mignone should have been returned to Unit 6, and Fagan should have been reassigned.
On May 9, 2012, Mignone reported to Lieutenant Lorieann Hunter that Sgt. Nuckols had inappropriately touched her thigh in November 2011. According to Mignone's testimony at trial, Nuckols called her over to him at the beginning of a shift while he was seated in a chair, and placed his hand on her thigh. When Mignone jumped back and asked what he was doing, Nuckols said that there was something on her pants. Nuckols denied the allegation.
Mignone was interviewed by Investigator Bill Johnson on August 7 and 15, 2012, concerning her complaint against Sgt. Nuckols. Mignone's co-worker Officer Keithly sat in on the second interview as a co-worker representative. During the second interview, Johnson pressured Mignone to put her statements in writing, even though she objected because she did not want to guess on dates. Mignone felt like Johnson wanted her to write something inaccurately so she could be punished. Johnson raised his voice, causing Mignone's heart to race. Keithly described Johnson's demeanor as "aggressive" because he was very pushy and would not give Mignone time to answer. Mignone became visibly upset. She hyperventilated and passed out, and struck her head as she fell, causing a concussion. Johnson did not get out of his seat to assist her. Mignone was transported to the hospital by ambulance, and was on leave for a week.
Beginning on October 3, 2012, supervisors completed a series of five "Employee Performance Log" entries concerning alleged acts of misconduct by Mignone, which became part of her personnel file. Mignone had not received any such log entries prior to October 2012.
The first entry concerned Mignone's alleged refusal on October 3, 2012 to report to Officer Holt to be interviewed as part of Holt's investigation. The log entry states that Mignone's conduct "demonstrate[d] blatant insubordination" and "a significant degree of unprofessionalism." The entry warned Mignone that "any further occurrences of this nature could result in further action being taken," and that she would "be closely monitored for any further incidents of this nature." The log entry was signed by multiple supervisory employees.
*31 Mignone protested the log entry, contending that she did not refuse to meet with Holt, but instead merely asked for additional information. She also contended that the request that she meet with Holt should have been directed to her attorney, who had previously notified the Department by certified mail that he was representing Mignone in connection with her claims of sexual harassment. The Department denied Mignone's request to remove the log entry from her personnel file. It documented its refusal to rescind the earlier log entry both in a letter, and in a further Performance Log entry, which was once again signed by multiple supervisors.
Mignone received a third log entry on December 12, 2012. This entry asserted that, in an interaction with an inmate, she "began making exaggerated gestures/movements with her arms and legs," which were "visibly on display to the offenders assigned to the wing." The log entry also contended that, in later reaching across a desk for paperwork to sign, Mignone "entered [another Corrections Officer's] personal space with her arms and upper torso," making her co-workers uncomfortable.
On January 16, 2013, Mignone was subject to a further log entry, in which she was accused of "sharing information of a sensitive/confidential nature" by informing another Corrections Officer that this lawsuit was pending, and that a supervisor "gave me a write up for nothing." The log entry also noted that another Corrections Officer reported to a supervisor's office with two unsigned, printed copies of a report Mignone had prepared concerning a claim of sexual harassment.
Finally, on January 30, 2013, a log entry was prepared contending that Mignone "was observed walking down the front walk at which time she turned around and skipped backwards halfway down the walk upon entering [Housing Unit] 10." The log entry contended that Mignone's conduct "poses a safety concern" and "appears unprofessional in nature."
Mignone testified that none of the log entries were justified; she explained that the claimed conduct did not occur, or that it was subject to a benign explanation. The evidence indicated that the log entries constituted a formal counseling, were the most severe form of discipline a Sergeant could issue without approval of higher-level supervisors, and that the log entries were recorded in an employee's annual performance appraisals. Mignone testified that she understood the log entries to be formal documents telling her she had done something wrong, and that they negatively impacted her employment. With respect to the December 2012 entry, Mignone testified that it made her feel "[d]egraded like no other."
Mignone was treated by a family-practice physician, Dr. Rodney Malisos, and by a clinical social worker, Christine Urie, in 2012 and 2013. Dr. Malisos testified that Mignone reported being "under a lot of stress," and told him that she was there for follow-up on a recent urgent care visit for anxiety. Dr. Malisos diagnosed Mignone with anxiety and post-traumatic stress disorder, and prescribed her fluoxetine, an antidepressant medication, and the "herbal product" Sentra AM.
Urie testified that Mignone's primary complaint on her first visit was that a coworker at WMCC had opened the bathroom door two times in January 2012. Mignone told Urie she was experiencing nightmares and physical symptoms, including a racing heart and fear at the workplace. Urie diagnosed Mignone with post-traumatic stress disorder. Urie also testified that the fact that Mignone "was getting written up directly caus[ed] or directly contribut[ed] to cause [her] to suffer *32 emotional distress." Urie characterized Mignone as "affect scared" because she believed she was going to lose her job.
Mignone submitted three claims to the jury: (i) sexual harassment based on Fagan's conduct and comments; (ii) retaliation for her complaints against Fagan, in the form of a job reassignment and Performance Log entries; and (iii) retaliation for complaint against Nuckols, in the form of Johnson's "hostile or intimidating" interview on August 15, 2012. The jury returned a verdict in favor of the Department and against Mignone on the sexual harassment claim, but found in her favor on both of her retaliation claims. The jury awarded Mignone $100,000 in actual damages, and assessed punitive damages at $400,000 on her claim of retaliation for reporting Fagan's conduct, and $600,000 on her claim of retaliation for reporting Nuckols' conduct. In addition to the compensatory and punitive damages awarded by the jury, the circuit court's judgment also awarded Mignone $276,186 in attorney fees and costs.
The Department appeals.
Discussion
I.
The Department's first three Points allege errors in the jury instructions.
Whether a jury was instructed properly is a question of law that this Court reviews de novo. This Court views the evidence in the light most favorable to submission of the instruction. The party challenging the instruction must show that the offending instruction misdirected, misled, or confused the jury, resulting in prejudice to the party challenging the instruction.
Ross-Paige v. St. Louis Metro. Police Dep't , 492 S.W.3d 164, 172 (Mo. banc 2016) (citations and internal quotation marks omitted). "Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action." Hervey v. Mo. Dep't of Corr. , 379 S.W.3d 156, 159 (Mo. banc 2012) (citation omitted).
A.
The Department first argues that the trial court erred in submitting jury Instruction No. 12, the verdict director submitting Mignone's claim that she was subject to retaliation based on her complaints of sexual harassment by Kevin Fagan. Instruction No. 12 included six alleged retaliatory actions, stated in the disjunctive. According to the Department, Mignone failed to present sufficient evidence to support each of the alleged acts, and the disjunctive submission therefore constituted reversible error.
Instruction No. 12, proffered by Mignone, read as follows:
Your verdict must be for plaintiff and against defendant on plaintiff's claim of unlawful retaliation if you believe:
First , Plaintiff reasonably believed that she was subjected to unwelcome comment(s) or conduct by Kevin Fagan, and
Second , either
Defendant reassigned Plaintiff from Housing Unit 6 to Administrative Segregation, or
Defendant issued Plaintiff a log entry for insubordination on or about October 11, 2012, or
Defendant issued Plaintiff a log entry on or about October 17, 2012, or
Defendant issued Plaintiff a log entry on or about Dec [sic] 12, 2012 for making exaggerated gestures/movements with her arms legs and for leaning across a desk, or *33 Defendant issued Plaintiff a log entry on or about January 16, 2013, for telling another officer she had a lawsuit pending against defendant, or
Defendant issued Plaintiff a log entry on or about January 30, 2013, for being "unprofessional" for walking backwards, and
Third, plaintiff's complaint of unwelcome comment(s) or conduct by Kevin Fagan was a contributing factor in any of the conduct in Paragraph Second , and
Fourth , such conduct directly caused or directly contributed to cause damage to plaintiff.
"In order for disjunctive verdict directing instructions to be deemed appropriate, each alternative must be supported by substantial evidence." Ross-Paige , 492 S.W.3d at 172.
In its briefing the Department "admits there was sufficient evidence that the alleged acts took place. " It argues, however, that the individual log notes should not have been submitted as independent acts of retaliation, because "there was not evidence to show that the five log notes resulted in damage to Mignone." The Department contends that the evidence indicated that log notes are not disciplinary, and that "Mignone testified that she was never demoted, lost pay, or suffered any other damages related to the log entries that would be cognizable under the MHRA." Although the Department acknowledges that Mignone testified to the emotional distress she suffered as a result of the log notes, it argues that "some evidence of damage beyond Mignone's own statements should have been offered."
The Department failed to preserve the argument raised in its first Point, because it did not make a specific objection to Instruction No. 12 on the basis that Mignone had failed to prove legally cognizable damage flowing from some of the hypothesized acts of retaliation.
Rule 70.03 requires that counsel "make specific objections to instructions considered erroneous." This rule further instructs that "[n]o party may assign as error the giving or failure to give instructions unless that party objects thereto before the jury retires to consider its verdict, stating distinctly the matter objected to and the grounds of the objection." Finally, Rule 70.03 requires that the objection be raised in a motion for new trial. "Timely objections [to an instruction] are required as a condition precedent to appellate review in order to afford the trial court an opportunity to correct any mistakes immediately and inexpensively without risking the delay and expense of an appeal and a retrial."
Ross-Paige , 492 S.W.3d at 170 (other citation omitted).
During the on-the-record instruction conference, the Department's counsel objected to Instruction No. 12 on multiple grounds. As relevant to the Department's first Point, counsel stated:
[W]e object to the sufficiency of evidence with respect to each of these acts of retaliation listed in paragraph 2. We do not believe that they have submitted enough evidence to offer these adverse or these alleged retaliatory acts within this.
The Department's vague, general objection to "the sufficiency of the evidence" to support the various retaliatory acts listed in Instruction No. 12, and its complaint that Mignone had not "submitted enough evidence" to support the disjunctive submission, preserved nothing for appellate review. "[A] vague, general objection preserves nothing for appellate review."
*34 McCrainey v. Kansas City Mo. Sch. Dist. , 337 S.W.3d 746, 755 (Mo. App. W.D. 2011) (citing Sparkman v. Columbia Mut. Ins. Co. , 271 S.W.3d 619, 625 (Mo. App. S.D. 2008) ). " 'The trial court has no obligation to ferret out specificity, which a party chooses not to distinctly articulate in its objection, in order to make an informed ruling on a general objection.' " Id. (quoting Sparkman , 271 S.W.3d at 625 ).
A general objection that a particular instruction is unsupported by sufficient evidence does not preserve a claim that the plaintiff has failed to present sufficient evidence to support a particular element of the claim. In the Sparkman case, defense counsel objected to a damages instruction " 'on the basis that there has been insufficient evidence to support it.' " 271 S.W.3d at 624. Despite the general nature of the objection at trial, on appeal the defendant sought to make a far more specific objection: that the damages instruction failed to correctly advise the jury as to the date from which prejudgment interest should be calculated, or the principal amount on which prejudgment interest could be awarded. Id. at 623-24. The Southern District held that the defendant's general objection at trial did not preserve the specific issues the defendant sought to raise on appeal:
Instruction No. 8 posits at least three factual elements in addition to the date from which interest should start accruing. Yet, nowhere in Columbia Mutual's objection does it specifically or distinctly mention the calculation of interest, nor does it specifically or distinctly mention the date used to calculate interest in any context, much less within the context of the evidence presented at trial. In the absence of an objection directing the trial court's attention to a specific element in a proffered multi-element instruction which the objecting party claims is not supported by evidence in the record and why in the context of the evidence presented during the trial the specified element is not supported by the evidence, a general objection to the entire instruction that it is not supported by the evidence preserves nothing for appellate review.
Id. at 625.[2]
Like in Sparkman , the retaliation claim Mignone submitted in Instruction No. 12 contained multiple factual elements which had to be satisfied with respect to each alleged retaliatory act. For example, as to each act, Mignone had to submit sufficient evidence to permit the jury to find that the act in fact occurred; that the act was taken by the Department as retaliation for Mignone's complaints of sexual harassment by Fagan; and that the act caused damage. Like in Sparkman , therefore, the Department was required to assert an objection which "direct[ed] the trial court's attention to a specific element in [the] proffered multi-element instruction which the [Department] claims is not supported by evidence in the record." The Department *35 failed to do so, and the specific objection it now raises in its first point is not preserved for review.
We would reject the Department's instructional error claim, even if that claim were adequately preserved. Citing Watson v. Heartland Health Laboratories, Inc. , 790 F.3d 856 (8th Cir. 2015), the Department argues that Mignone failed to prove a submissible claim that the log entries constituted actionable retaliation, because the Department "did not reduce [Mignone's] pay, lower her work hours, and did not change her job duties" as a result of the purportedly retaliatory log entries. Id. at 864.
The Department's argument fails to acknowledge the difference between retaliation claims asserted under federal and Missouri law. The Missouri Supreme Court has held that the Missouri Human Rights Act's anti-retaliation provision is broader than the comparable provision of Title VII, and that caselaw interpreting federal anti-retaliation provisions is not relevant to the interpretation of the corresponding provisions of the MHRA:
The Missouri Human Rights Act prohibits discrimination in housing, commercial real estate loans, employment, public accommodations, and the sale or rental of real estate. § 213.010, et seq. , RSMo 1994. Additionally, section 213.070 states:
It shall be an unlawful discriminatory practice:
(2) To retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by this chapter or because such person has filed a complaint, testified, assisted, or participated in any manner in any investigation, proceeding or hearing conducted pursuant to this chapter.
....
42 U.S.C. § 2000e-3(a) (1988) prohibits employers from retaliating against employees who assert their employment rights.
It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice ... or because he has made a charge ... under this title.
It is immediately obvious that the language employed by the Congress in 42 U.S.C. § 2000e-3(a) is considerably more limited than the exceedingly broad "in any manner against any other person" language adopted by the Missouri legislature in section 213.070. Indeed, the difference in the language employed by the two statutes is sufficiently stark to render judicial interpretations of the federal law inapposite for purposes of assigning meaning to section 213.070.
Keeney v. Hereford Concrete Prods., Inc. , 911 S.W.2d 622, 624 (Mo. banc 1995) (emphasis omitted).
The Supreme Court in Keeney went on to specifically hold that a federal requirement that acts of retaliation have a concrete impact on the terms and conditions of a plaintiff's employment did not apply to claims brought under the MHRA.
[T]he trial court ruled against Keeney "because the evidence does not demonstrate that the alleged retaliatory action had any impact on Plaintiff's future employment or employability." This ruling erroneously imposes federal interpretations of 42 U.S.C. § 2000e-3(a) on section 213.070.
Federal judicial interpretations of 42 U.S.C. § 2000e-3(a) require (1) that the employee engaged in an activity protected by the statute, (2) that adverse employment action occurred, and (3) that a *36 causal connection exists between the two. An adverse employment action occurs where a former employee suing for retaliation, demonstrates that the retaliatory action adversely affects his/her future employment or employability.
Under section 213.070, retaliation must be given a broader meaning.... Thus, retaliation exists under section 213.070 when (1) a person files a complaint, testifies, assists or participates in an investigation, proceeding or hearing conducted pursuant to chapter 213 and (2), as a direct result, he or she suffers any damages due to an act of reprisal. This Court cannot judicially impose a requirement outside of the plain language in section 213.070. Here, the trial court applied the wrong legal standard for determining if retaliation occurred under that section.
Id. at 625-26 (other citations omitted). "Our Missouri Supreme Court has explained that, although federal law requires a retaliation claimant to demonstrate that an 'adverse employment action' has occurred ('adverse employment action' generally meaning some change in pay, benefits, seniority, responsibility, etc.), the MHRA does not." Walsh v. City of Kansas City , 481 S.W.3d 97, 106 (Mo. App. W.D. 2016) (citing Keeney , 911 S.W.2d at 625 ).
Under Keeney , a plaintiff alleging unlawful retaliation need only establish that, "as a direct result, he or she suffers any damages." 911 S.W.2d at 625. "Actual damages under the MHRA in an employment-discrimination claim may include awards for emotional distress, humiliation, and suffering." Wilkins v. Bd. of Regents of Harris-Stowe State Univ. , 519 S.W.3d 526, 538 (Mo. App. E.D. 2017) (citation omitted). Unlike in common-law tort actions, "we do not limit recovery of damages for emotional distress to those situations in which the distress is medically diagnosable or of sufficient severity to be medically significant," and such an award may be established by testimony-including the testimony of the plaintiff-or inferred from the circumstances. State ex rel. Sir v. Gateway Taxi Mgmt. Co. , 400 S.W.3d 478, 492-93 (Mo. App. E.D. 2013) ; State ex rel. Dean v. Cunningham , 182 S.W.3d 561, 567-68 (Mo. banc 2006) ; Wilkins , 519 S.W.3d at 538 ; Soto v. Costco Wholesale Corp. , 502 S.W.3d 38, 54-55 (Mo. App. W.D. 2016).
Mignone presented sufficient evidence to support a jury finding that she was damaged by each of the acts of retaliation hypothesized in Instruction No. 12. With regard to her transfer within the facility, Mignone testified that she wished to remain in Housing Unit 6, and asked to be transferred back to Unit 6. Mignone also testified that she was transferred to more dangerous assignments, including in the administrative segregation unit and in an area of the prison where inmates had access to kitchen and eating utensils. Mignone testified that her transfer was "stressful."
With respect to the log entries, Mignone testified that she considered the log entries to constitute discipline. Similarly, her supervisor Sgt. Nuckols testified that while he might use undocumented verbal counseling as a form of informal discipline, he considered log entries to be a second step in disciplining employees which could be reflected in their annual performance review. The evidence indicated that at least one of Mignone's log entries did appear in her annual review. She had never received such log entries until she complained of Fagan's actions.
Mignone testified that she considered one of the log entries to be "overkill," and she testified that another of the entries made her feel "degraded like no other."
*37 Further, the clinical social worker that Mignone saw, Christine Urie, testified to a reasonable degree of professional certainty that the fact that Mignone "was getting written up directly caus[ed] or directly contribut[ed] to cause [her] to suffer emotional distress." Urie also testified that she described Mignone as "affect scared" because Mignone believed she was going to lose her job.
Viewing this evidence in the light most favorable to Mignone, it was sufficient to support an inference that each of the allegedly retaliatory actions listed in Instruction No. 12 resulted in damages to her. The circuit court did not err in listing these actions disjunctively in Instruction No. 12.
Point I is denied.
B.
In its second Point, the Department contends that the trial court erred in submitting jury Instructions No. 12 and 13, because those instructions failed to require the jury to find that Mignone made complaints of sexual harassment by Fagan and Nuckols, and that her complaints were made in good faith.
Instruction No. 12 is reproduced in § I.A., above. The relevant portion of Instruction No. 13 instructed the jury that their verdict should be for Mignone if they found:
First, Plaintiff reasonably believed that she was subjected to unwelcome comment(s) or conduct by James Nuckols, and
Second, Bill Johnson interviewed Plaintiff in a hostile or intimidating manner on August 15, 2012, and
Third, plaintiff's complaint of unwelcome comment(s) or conduct by James Nuckols was a contributing factor in the conduct in Paragraph Second, and
Fourth , such conduct directly caused or directly contributed to cause damage to plaintiff.
"To establish a prima facie case of retaliation requires that a plaintiff prove: (1) she complained of discrimination; (2) the employer took adverse action against [her]; and (3) a causal relationship existed between the complaint and the adverse action." Minze v. Mo. Dep't of Pub. Safety , 437 S.W.3d 271, 275-76 (Mo. App. W.D. 2014) (citation omitted).
A retaliation claim is not conditioned on the success of the underlying discrimination or harassment claim. Thus, it is irrelevant to a claim of retaliation that the act complained of was not legally actionable. The only issue is whether the person making the complaint had a reasonable good faith belief that there were grounds for the claim of discrimination or harassment.
Soto v. Costco Wholesale Corp. , 502 S.W.3d 38, 48 (Mo. App. W.D. 2016) (quoting Minze , 437 S.W.3d at 275-76 ); accord , McCrainey v. Kansas City Mo. Sch. Dist. , 337 S.W.3d 746, 754 (Mo. App. W.D. 2011).
In Hervey v. Missouri Department of Corrections, 379 S.W.3d 156 (Mo. banc 2012), the Missouri Supreme Court emphasized that "the verdict director ... must instruct the jury to find all ... of ... [the] elements to find for the plaintiff. Assuming a disputed fact is error." Id. at 160 (citation and internal quotation marks omitted).
The Department is correct that Instructions No. 12 and No. 13 do not expressly require the jury to find that Mignone complained of sexual harassment by Fagan or Nuckols.[3] The omission of *38 that element is not necessarily reversible error, however. "Instructional errors are reversed only if the error resulted in prejudice that materially affects the merits of the action." Hervey , 379 S.W.3d at 159 (citation and internal quotation marks omitted). "There can be no prejudicial error where an instruction omits an element that is not in dispute." Citizens Bank of Appleton City v. Schapeler, 869 S.W.2d 120, 129 (Mo. App. W.D. 1993) ; accord , Boggs ex rel. Boggs v. Lay , 164 S.W.3d 4, 20 (Mo. App. E.D. 2005) ("When a fact material to a plaintiff's case is conceded or undisputed, its inclusion under an approved jury instruction is not mandatory."; quoting Sheehan v. Nw. Mut. Life Ins. Co. , 103 S.W.3d 121, 127 (Mo. App. E.D. 2002) ).
The fact that Mignone had made complaints of sexual harassment by Fagan and Nuckols was not disputed, and was in fact admitted by the Department in its Answer, and in its opening statement and closing argument at trial. Rather than disputing that Mignone had made complaints, the Department contended that it had responded, promptly and effectively, to those complaints. Given that it was undisputed that Mignone had made complaints of sexual harassment, the failure of Instructions No. 12 and No. 13 to require the jury to find that such complaints had been made does not rise to the level of reversible error.
The Department also complains that the verdict directors failed to require the jury to find that Mignone had a "good faith" belief that the conduct she opposed violated the MHRA. Under Missouri law, it is unnecessary for a plaintiff claiming retaliation to prove that the conduct they opposed was actually unlawful. Instead, a plaintiff need only have "a reasonable good faith belief that there were grounds for the claim of discrimination or harassment." Soto , 502 S.W.3d at 48. Here, Instructions No. 12 and No. 13 both required the jury to find that Mignone "reasonably believed" that Fagan's and Nuckols' conduct was wrongful. The instructions did not separately require the jury to find that Mignone believed in the wrongfulness of their actions in "good faith."
Consistent with Soto , Instructions No. 12 and No. 13 should have required the jury to find that Mignone had a reasonable, good-faith belief that the conduct she challenged violated the MHRA. The Department cites no authority to suggest, however, that the omission of "good faith" materially affected the jury's verdicts, when the relevant instructions already required the jury to find that Mignone's belief was "reasonable." In its Reply Brief, the Department suggests that requiring the jury to find a "good faith" belief would have required it to find that Mignone subjectively believed that she had grounds for complaint, while the requirement of a "reasonable belief" embodies only an objective standard. In the absence of authority indicating that a jury would understand the requirements of "good faith" and "reasonableness" differently, we are unwilling to hold that the omission of "good faith" from the verdict directors constituted reversible error. We note that, in the analogous context of federal anti-retaliation and "whistleblower"-protection statutes, federal courts have repeatedly held that a requirement that a worker have a "reasonable belief" in the illegality of conduct includes *39 both objective and subjective components.[4]
C.
In its third Point, the Department contends that Instructions No. 12 and No. 13 were erroneous, because they failed to instruct the jury on the elements of a hostile work environment claim.
Mignone did not assert a hostile work environment claim, however. Mignone's claims of retaliation focused on discrete actions taken by the Department, allegedly as reprisals for her complaints of sexual harassment, rather than on the overall work environment created by the Department's actions in the aggregate. Mignone's retaliation claims arise under a different statutory provision ( § 213.070, RSMo ) than a hostile work environment claim (§ 213.055), and the claims have different elements.[5]
Mignone was "the master of ... her lawsuit and [could] choose which causes of action to plead." Cox v. Kansas City Chiefs Football Club, Inc. , 473 S.W.3d 107, 118 (Mo. banc 2015). As explained in § I.A., above, the discrete acts alleged in Instruction Nos. 12 and No. 13 were independently submissible as acts of purported retaliation, despite the Department's claim that Mignone presented insufficient evidence of legally cognizable damages. Even if the facts alleged by Mignone may have also supported a hostile work environment claim, the Department cites no authority which would require her to submit her claim as a hostile work environment, and we are aware of none.
Point III is denied.
II.
In its fourth Point the Department challenges the admission of testimony from a female witness who had also been subject to sexual advances by Fagan, and the admission of a report of the Department's investigation of Johnson's interview of Mignone.
A trial court enjoys considerable discretion in the admission or exclusion of evidence, and, absent clear abuse of discretion, its action will not be grounds for reversal. A ruling constitutes an abuse of discretion when it is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration. By both statute and rule, an appellate court is not to reverse a judgment unless it believes the *40 error committed by the trial court against the appellant materially affected the merits of the action.
Cox , 473 S.W.3d at 114 (citations and internal quotation marks omitted).
A.
The Department's challenges the admission of the testimony of Mary Ellington, a former Corrections Officer I at the Cameron prison. Ellington testified that Fagan made her feel uncomfortable during her initial employment training, that he stared at her when they saw each other in the prison, and that he asked her out to eat and invited her for rides on his motorcycle. Ellington testified that she considered Fagan's conduct flirtatious and inappropriate, given that she was married. Ellington also testified, however, that Fagan's behavior was never aggressive or angry, and that she never made a complaint concerning Fagan's behavior, or reported her discomfort to supervisors.
Even if the circuit court erred in admitting Ellington's testimony, the Department was not prejudiced. Despite admission of Ellington's testimony, the jury found in the Department's favor, and against Mignone, on her claim of sexual harassment by Fagan-the claim to which Ellington's testimony was relevant. Because Ellington did not report Fagan's actions to management, her testimony did nothing to establish the Department's knowledge of Fagan's tendencies, or the Department's response to complaints of sexual harassment, and it therefore had no direct relevance to Mignone's retaliation claim.[6] Given that Ellington's testimony was only relevant to a claim on which the Department prevailed, it was not prejudiced by the admission of that testimony.
B.
The Department's fourth Point also challenges the admission of Mignone's Exhibit ZZZ, a report prepared by the Department's Director of Human Resources, Bridget White, based on her investigation of Johnson's interview of Mignone. With attachments, Exhibit ZZZ totaled 117 pages in length.
Although the Department now argues that Exhibit ZZZ was improperly admitted because Mignone failed to lay a proper foundation and the exhibit contains hearsay, it offered only a more limited objection at trial:
This is one of those investigations where I think there's a risk of some confusion on the part of her conclusions. She essentially concludes that he violated the policy, but he didn't do it because it was gender or in retaliation. I think there's a risk of-in eliciting all of these conclusions to confuse the jury about whether or not this is in some respects a violation of law or a violation of policy.
" '[A] point on appeal must be based upon the theory voiced in the objection at trial and an appellant cannot expand or change on appeal the objection as made.' " Gamble v. Browning , 379 S.W.3d 194, 205 (Mo. App. W.D. 2012) (quoting Carroll v. Kelsey , 234 S.W.3d 559, 563 (Mo. App. W.D. 2007) ). Therefore, the only objection properly before this Court on appeal is the objection that the conclusions of White's report created a risk of confusing the jury, since the report drew conclusions only as to Johnson's violation of *41 departmental policy , but not as to whether he violated anti-discrimination laws.
White's report included summaries of interviews with Johnson, Mignone, and other Department employees with knowledge of Johnson's August 2012 interviews of Mignone. None of these interview summaries were subject to the Department's objection. Those unobjected-to interview summaries were obviously relevant to Mignone's retaliation claim based on Johnson's interviews. The circuit court did not abuse its discretion in concluding that the probative value of the report as a whole was not outweighed by any danger of confusing the jury based on the report's conclusions. The report makes clear that White's investigation only "partially substantiated" Mignone's allegations. In particular, White emphasized that she "was unable to substantiate whether Mr. Johnson acted in an intimidating manner towards COI J. Mi[g]none due to her protected class." Instead, White concluded only that Johnson violated Department policies by failing to treat information developed during his investigation as confidential; by failing to hold himself to an appropriate standard of conduct by using profanity, and derogatory and aggressive language, during his interviews of Mignone and others; and by not being fully truthful during the investigation. It would have been clear to the jury that White's report did not come to any conclusion on the issue they were required to decide with respect to Johnson's interviews of Mignone: whether Johnson conducted those interviews in a hostile manner in retaliation for Mignone's complaint of sexual harassment by Nuckols.
Point IV is denied.
III.
The Department's Point V contends that the circuit court erroneously submitted the issue of punitive damages to the jury on both of Mignone's retaliation claims.
"Section 213.111 provides that the court may award punitive damages to the plaintiff in an action filed pursuant to the MHRA." Alhalabi v. Missouri Dept. of Nat. Res. , 300 S.W.3d 518, 528 (Mo. App. E.D. 2009).
A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted either by a wanton, willful or outrageous act, or reckless disregard for an act's consequences (from which evil motive is inferred). The defendant must have intentionally committed a wrongful act without just cause or excuse.
Whether there is sufficient evidence to support an award of punitive damages is a question of law. We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility. A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity-that is, it was highly probable-that the defendant's conduct was outrageous because of evil motive or reckless indifference.
Howard v. City of Kansas City , 332 S.W.3d 772, 788 (Mo. banc 2011) (citations and internal quotation marks omitted).
"Punitive damages may be proven by circumstantial evidence and there is no requirement of direct evidence of intentional misconduct as most employment discrimination cases are inherently fact-based and necessarily rely on inferences rather than direct evidence."
*42 McGhee v. Schreiber Foods, Inc. , 502 S.W.3d 658, 674 (Mo. App. W.D. 2016) (citation omitted). "The same evidence supporting the discrimination claim can also support a claim for punitive damages." Id.
With respect to the submission of punitive damages on Mignone's retaliation claim involving her complaints against Fagan, the Department once again contends "that the evidence demonstrated the actions alleged in instruction 12 did not damage Mignone." We explained in § I.A., above, that Mignone presented sufficient evidence of the retaliatory acts submitted in Instruction No. 12, despite the Department's claim that Mignone failed to present sufficient evidence of damages. To the extent the Department repeats its earlier argument in Point V, we reject it for the reasons previously stated.
The actions alleged in Instruction No. 12 supported an award of punitive damages. Department witnesses testified that a transfer would be improper if an officer did not want to be transferred, and that in the circumstances of this case, Fagan should have been transferred out of Housing Unit 6, not Mignone. The evidence indicated that the Department transferred Mignone based on an alleged threat to her safety which the Department's own investigation concluded was fabricated. Moreover, when Mignone requested that she be returned to Unit 6, the Warden falsely told her that the Department's investigation of the death threat had not concluded. The Department's failure to promptly advise Mignone that it had concluded that the threat had been fabricated left Mignone to worry that she was in danger of attack from prison inmates.
As we discussed in § I.A., the jury could determine that the various performance log entries made by Department personnel were intended as discipline, and that Mignone was justifiably concerned as to how those log entries would affect her tenure with the Department. The log entries were hardly isolated, random acts. There was evidence of five separate entries, each of which the jury could find lacked a good-faith, performance-related justification. These included entries for allegedly making exaggerated gestures with her arms and legs; leaning across a desk in a purportedly provocative manner; walking or skipping backwards; telling inmates to stop making sexual comments to her; and asking that a previous log entry be removed from her file. The jury could reasonably conclude that these behaviors, even if they occurred, did not deserve a formal written reprimand. In addition, several of the log entries were signed by multiple supervisors, which would magnify the significance of the log entries from Mignone's perspective, but also reflects that the preparation of these entries was reviewed, and approved, by multiple senior Department employees. It is significant that Mignone did not receive a single performance log entry during the first three years of her employment, but instead received uniformly positive performance appraisals until she filed a complaint against Fagan. Following her complaint, she received five log notes in the course of four months. See Williams v. Trans States Airlines, Inc. , 281 S.W.3d 854, 871 (Mo. App. E.D. 2009) (affirming submission of punitive damages involving allegedly retaliatory discharge, where employee had no prior history of performance deficiencies, and evidence suggested that claims of deficient performance were unfounded).
With respect to the retaliation claim involving Mignone's complaint against Sgt. Nuckols, the Department contends that the evidence established that it "promptly responded to the actions alleged" by removing Johnson from the investigation of Mignone's complaint, and by initiating an investigation of Johnson himself. While *43 DOC's attempts to rectify Johnson's misconduct were commendable, they do not negate or neutralize the severity of Johnson's actions during his August 15, 2012 interview of Mignone, as a result of which she started hyperventilating, lost consciousness, suffered a concussion and was hospitalized. The evidence indicated that Johnson had been the subject of prior written complains, and one other employee who had been subject to a hostile interview by Johnson testified during trial. In addition, the evidence indicated that, during his earlier interview of Mignone on August 7, 2012, Johnson's aggressive questioning techniques led Mignone's co-worker representative to request a break, and advise Johnson to proceed in a less aggressive manner. Despite the earlier interview, Johnson persisted on August 15, with serious consequences. When Mignone lost consciousness and collapsed, Johnson showed no concern, but remained seated. This evidence, viewed in the light most favorable to the submissibility of punitive damages, was sufficient to justify the submission of Mignone's punitive damages claim involving the Johnson interviews.
Point V is denied.
IV.
In its final Point, the Department argues that the circuit court erroneously failed to remit the punitive damages award of $1,000,000, which included a $400,000 award on Mignone's retaliation claim for complaining about Fagan's sexual harassment, and a $600,000 award on her retaliation claim relating to her complaint of sexual harassment by Sgt. Nuckols. The Department argues that the awards deny it due process of law.
Punitive damages are subject to the limitations of the Due Process Clause of the Fourteenth Amendment, which "prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." Lewellen v. Franklin , 441 S.W.3d 136, 145 (Mo. banc 2014) (quoting State Farm Mut. Auto. Ins. Co. v. Campbell , 538 U.S. 408, 416, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003), quoting, in turn, Cooper Indus., Inc. v. Leatherman Tool Gp., Inc. , 532 U.S. 424, 434, 121 S.Ct. 1678, 149 L.Ed.2d 674 (2001) and BMW of N. Am., Inc. v. Gore, 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996) ).
[C]ourts reviewing punitive damages [are instructed] to consider three guideposts: (1) the reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages award and penalties authorized or imposed in comparable cases.
State Farm , 538 U.S. at 418, 123 S.Ct. 1513 ; accord , Lewellen , 441 S.W.3d at 146 (citation omitted). In an MHRA claim, only the first two guideposts are considered. "The factor of comparative penalties is inconsequential ... in an MHRA case." Diaz v. Autozoners , LLC, 484 S.W.3d 64, 90 (Mo. App. W.D. 2015) (quoting Brady v. Curators of Univ. of Mo. , 213 S.W.3d 101, 111 (Mo. App. E.D. 2006) ) (internal quotation marks omitted).
"[T]he degree of reprehensibility of the defendant's conduct" is "the most important indicium of the reasonableness of a punitive damages award." State Farm , 538 U.S. at 419, 123 S.Ct. 1513 ; Lewellen , 441 S.W.3d at 146. In determining reprehensibility of the defendant's conduct, courts consider whether:
the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved *44 repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.
State Farm, 538 U.S. at 419, 123 S.Ct. 1513 ; Lewellen , 441 S.W.3d at 146.
The Department argues that, considering the State Farm factors, its conduct was not reprehensible. We disagree. With respect to Mignone's first retaliation claim, the jury could find that her transfer out of Housing Unit 6, and the failure to return her to Unit 6, involved trickery and deceit, rather than mere accident. The Department's own investigator agreed with Mignone's assessment that the fabricated inmate threat was "a ploy to get her out of six (6) house," and the Warden used further deception when Mignone sought to return, by falsely denying that the internal investigation of the threat had concluded. The Department then engaged in a pattern of retaliation through repeated unjustified log entries, which were approved by multiple supervisory employees. "Though it is true that [Mignone]'s harm was neither physical nor economic, it was certainly emotional and psychological," Diaz , 484 S.W.3d at 90, resulting in emotional distress that was severe enough that she was diagnosed with anxiety and post-traumatic stress disorder, and prescribed medication. The acts underlying Mignone's first retaliation claim, when viewed in the aggregate,[7] were sufficiently reprehensible to justify a punitive award of $400,000.
Similarly, Johnson's retaliatory conduct during his interview of Mignone on August 15, 2012, was severe enough to justify $600,000 in punitive damages. Both Mignone and her co-worker representative, who was present at the interview, testified that Johnson behaved in an aggressive and intimidating manner throughout the interview. Johnson engaged in this behavior despite the fact that Mignone had reacted adversely to his interviewing techniques a week earlier, and despite the fact that Mignone repeatedly told Johnson that her heart was racing and that she was not feeling well. When Mignone lost consciousness, Johnson did nothing to help her. As a result of the interview, Mignone suffered a concussion and was on leave from work for a week. Johnson's conduct during the August 15, 2012 interview was consistent with his prior behavior, which had been the subject of formal complaints. We find that Johnson's behavior, resulting in physical harm to Mignone and evidencing an indifference to her health and safety, was sufficiently reprehensible to warrant an award of $600,000 in punitive damages.
The Department also argues that the ratio between the actual and punitive award was so disproportionate as to be excessive.
With regard to the second Gore guidepost, [the Supreme Court of the United States] has been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award; but, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages will satisfy due process. Single-digit multipliers are more likely to comport with due process, while still achieving the State's deterrence and retribution goals.... Because there are no rigid benchmarks, ratios greater than those that this Court *45 has previously upheld may comport with due process where a particularly egregious act has resulted in only a small amount of economic damages, but when compensatory damages are substantial, then an even lesser ratio can reach the outermost limit of the due process guarantee.
State Farm , 538 U.S. at 410, 123 S.Ct. 1513 (citations omitted).
In this case the ratio between $100,000 in actual damages and $1,000,000 in punitive damages does not violate due process principles. Although the ratio was ten-to-one, Missouri courts have approved punitive damages awards in MHRA cases with even higher ratios between the actual and punitive damage awards. We recently collected several such cases in McGhee v. Schreiber Foods, Inc. , 502 S.W.3d 658, 675 (Mo. App. W.D. 2016) :
Diaz [v.Autozoners, LLC ], 484 S.W.3d [64, 91-92 (Mo. App. W.D. 2015) ] (upholding $1,000,000 in punitive damages with $75,000 in compensatory damages in discrimination case); Ellison [v. O'Reilly Automotive Stores, Inc. ,] 463 S.W.3d [426, 441-42 (Mo. App. W.D. 2015) ] (upholding $2,000,000 in punitive damages with $200,000 in compensatory damages in discrimination case); Bowolak [v. Mercy East Communities ], 452 S.W.3d [688, 699 (Mo. App. E.D. 2015) ] (upholding a punitive damages award of $500,001 with $50,000 in compensatory damages in discrimination case); Lynn v. TNT Logistics N. Am. Inc. , 275 S.W.3d 304, 310 (Mo. App. W.D. 2008) (MHRA case where jury awarded $6.75 million in punitive damages, $50,000 in compensatory damages, trial court remitted the punitive damages to $450,000, and this court found the amount of remittitur to be abuse of discretion and increased the punitive damages award to $3.75 million).
In light of these cases, and given the nature of the Department's conduct in this case, the ratio between compensatory and punitive damages in this case is not so extreme that it justifies a reduction in the punitive damage award.
Point VI is denied.
V.
Finally, Mignone filed a motion for attorney's fees on appeal. Although the Department opposes the amount of the fees Mignone seeks, it does not contest her right to recover fees related to the litigation of this appeal.
Section 213.111.2 authorizes a court to award "reasonable attorney fees to the prevailing party." A prevailing party is one that succeeds on any significant issue in the litigation which achieved some of the benefit the parties sought in bringing suit. Where a plaintiff has prevailed in an action under the MHRA, the court should award attorneys' fees unless special circumstances would render such an award unjust. This includes fees incurred on appeal from the trial court's judgment.
Soto , 502 S.W.3d at 58 (citations and internal quotation marks omitted).
Because we are affirming the circuit court's judgment in her favor, Mignone is the prevailing party and is entitled to an award of her attorney's fee on appeal. Id. However, "we remand the cause to the trial court for the purpose of conducting a hearing to determine the reasonableness of the costs and fees requested, and to enter an appropriate award." Id. "Although appellate courts have authority to allow and fix the amount of attorney's fees on appeal, we exercise this power with caution, believing in most cases that the trial court is better equipped to hear evidence *46 and argument on this issue and determine the reasonableness of the fee requested." Id. (internal quotation marks omitted).
Conclusion
The circuit court's judgment is affirmed. The case is remanded to the circuit court for it to award Mignone her reasonable attorney's fees and expenses related to this appeal.
All concur.

During cross-examination by the Department's counsel, Mignone testified that she requested to be transferred out of Housing Unit 6 on February 9. On re-direct examination, she clarified that she did not request to be transferred out of Unit 6, but merely stated that she did not want to work with Fagan.

For other cases finding general objections to instructions to be ineffective to preserve specific arguments for appeal, see, e.g. , Barkley v. McKeever Enterprises, Inc. , 456 S.W.3d 829, 841 (Mo. banc 2015) (general objection that verdict director was "not supported by the evidence" was insufficient to preserve plaintiff's claim that certain batteries committed by merchant occurred after merchant recovered its merchandise from plaintiff, and were therefore not protected by "merchant's privilege"); Peel v. Credit Acceptance Corp. , 408 S.W.3d 191, 199 (Mo. App. W.D. 2013) (" 'a simple objection on the basis that the instruction fails to state the applicable law or fails to contain all of the necessary elements of a cause of action, standing alone, is considered a general objection, preserving nothing for appellate review' " (citation omitted)); McCrainey , 337 S.W.3d at 755 (an objection which "vaguely asserts that the instructions do not comply with M.A.I. without stating how they are deficient" is insufficient to preserve specific objections for review).

The third paragraph of each instruction required the jury to determine whether Mignone's complaints of sexual harassment were a contributing factor in causing the retaliatory actions. The Missouri Supreme Court's analysis in Hervey makes clear, however, that the third paragraphs of each instruction cannot be read to require the jury to find that complaints were filed; instead, those paragraphs merely assume the existence of such complaints. Hervey , 379 S.W.3d at 161-62.

See , e.g. , Rhinehimer v. U.S. Bancorp Invs., Inc. , 787 F.3d 797, 811 (6th Cir. 2015) (interpreting anti-retaliation provision of Sarbanes-Oxley Act, 18 U.S.C. § 1514A(a)(1) ; "As the term itself indicates, reasonable belief involves both a subjective component and an objective component."); Beacom v. Oracle Am., Inc. , 825 F.3d 376, 380 (8th Cir. 2016) (same); Deltek, Inc. v. Dep't of Labor , 649 Fed. Appx. 320, 328 (4th Cir. 2016) (same); Veard v. F & M Bank , 704 Fed. Appx. 469, 474 (6th Cir. 2017) (interpreting whistleblower-protection provision of Consumer Financial Protection Act, 12 U.S.C. § 5567(a) ); Craine v. Nat'l Science Found. , 687 Fed. Appx. 682, 691 (10th Cir. 2017) (interpreting whistleblower-protection provision in 41 U.S.C. § 4712(a)(1) ).

We have described the elements of a retaliation claim in § I.B., above.
To prevail on a hostile work environment claim, plaintiffs were required to prove that (1) they were members of a protected group; (2) they were subjected to unwelcome protected group harassment; (3) their membership in a protected group was a contributing factor in the harassment; and (4) a term, condition, or privilege of their employment was affected by the harassment.
Hill v. City of St. Louis , 371 S.W.3d 66, 70-71 (Mo. App. E.D. 2012).

In its Reply Brief the Department argues that Ellington's testimony bolstered Mignone's retaliation theory that the Department "does not take sexual harassment seriously." We fail to see how Ellington's testimony could have had that effect, however, when there was no evidence that the Department was even aware of Fagan's conduct toward Ellington.

At oral argument the Department argued that, because the various acts of retaliation listed in Instruction No. 12 were submitted in the disjunctive, it was necessary that each individual alleged retaliatory act, considered in isolation, be sufficient to support the entire punitive award. The Department did not make this argument in its briefing, and we therefore do not address it.