

# In the
# Missouri Court of Appeals
## Western District

| | |
|---|---|
| **RAYMOND BROVONT, M.D.,** ) | |
| ) | |
| **Appellant-Respondent,** ) | **WD82544 Consolidated with** |
| ) | **WD82552** |
| **v.** ) | |
| ) | **OPINION FILED: October 13, 2020** |
| **KS-I MEDICAL SERVICES, P.A.** ) | |
| **AND MO-I MEDICAL SERVICES,** ) | |
| **LLC,** ) | |
| ) | |
| **Respondent-Appellants.** ) | |

**Appeal from the Circuit Court of Jackson County, Missouri**
The Honorable Marco Roldan, Judge

Before Division Three: Gary D. Witt, Presiding Judge, Lisa White Hardwick, Judge and
Thomas N. Chapman, Judge

KS-I Medical Services, P.A. ("KS-I"), a Kansas corporation, and MO-I Medical

Services, LLC ("MO-I"), a Missouri limited liability company, appeal from the October 5,

2018 judgment entered by the Circuit Court of Jackson County, Missouri ("trial court"),[1]

after a jury verdict in favor of Raymond Brovont, M.D. ("Dr. Brovont") on his claim for

damages for wrongful discharge in violation of public policy. Dr. Brovont timely cross-

---

[1] KS-I and MO-I also appeal from the orders entered January 31, 2019, overruling their Motion to Alter or Amend the Judgment and Hold a Mandatory Hearing with Respect to Punitive Damages or, in the Alternative, for Remittitur; Motion for New Trial; MO-I's Motion for Judgment Notwithstanding the Verdict; and KS-I's Motion for Judgment Notwithstanding the Verdict.

1

appealed from the trial court's judgment. This court consolidated the two appeals under case number WD82544, and for purposes of Rule 84.04(i),[2] Dr. Brovont, the plaintiff below, was deemed the appellant, and KS-I and MO-I, the defendants below, were deemed the respondents. The trial court's judgment is affirmed in part, reversed in part, and modified according to this court's rulings pursuant to Rule 84.14.

## Factual and Procedural History[3]

HCA, Inc. ("HCA") contracted with EmCare Holdings, Inc. ("EmCare") to provide physician staffing at hospitals that HCA owned and operated in the Kansas City area, in both Missouri and Kansas. EmCare, publicly traded on the NYSE, is the nation's largest physician management company, with nearly 16,000 clinicians providing patient care in more than 4,600 hospitals and other healthcare facilities nationwide.

Because regulations prohibit publicly traded companies or for-profit corporations from owning physician practice groups, EmCare's business model is to create a separate subsidiary legal entity for each state and in some circumstances for each location at which it supplies physicians to provide emergency medical services. KS-I and MO-I are examples of such subsidiary legal entities. EmCare then makes a physician the owner of these subsidiaries to comply with the regulations, which prohibit a publicly traded company from providing medical services. Dr. Brovont was, at the relevant times of this lawsuit, employed by two of these subsidiaries, KS-I and MO-I.

---

[2] All rule references are to MISSOURI COURT RULES – STATE 2020.
[3] The facts are viewed in the light most favorable to the jury's verdict. *Wynn v. BNSF Ry. Co.,* 588 S.W.3d 907, 909 n.2 (Mo. App. W.D. 2019).

EmCare has hundreds, if not thousands, of such subsidiaries across the United States. Gregory Byrne, M.D., a Dallas-based physician employed by EmCare, is the sole owner of KS-I. At any given period of time he also owns between 275 and 300 other EmCare subsidiaries in at least 20 different states. The exact number of EmCare subsidiaries he owns changes every month, and he does not keep track of them or take any management role in any of them. The number does not matter to him because all the profits of the subsidiaries flow to EmCare. The owners of the subsidiaries are simply paid a salary by EmCare. The payroll, human resources, legal, physician recruiting, and operation of each subsidiary was controlled by EmCare, and they would forward operational documents for the physician "owner" of the subsidiary to sign.

Though EmCare is careful to maintain corporate formalities between itself and its various subsidiaries, the subsidiaries are managed and operated by persons who are agents of the subsidiaries but who are also directly connected to the parent corporation, EmCare. Dr. Patrick McHugh ("Dr. McHugh") was, at all relevant times, both the Executive Vice President of EmCare and directly responsible for all hospital subsidiary contracts in the Kansas City metropolitan area on both sides of the state line, including MO-I and KS-I. Dr. McHugh, as an agent of both companies, had complete authority to hire or terminate a physician and directly influence the ability of any such physician to work for MO-I or KS-I or any other hospitals in the Kansas City area that had contracts with one of EmCare's subsidiaries.

Dr. Brovont specialized in the practice of emergency medicine. In 2010, when he came to the Kansas City area, he signed a contract with MO-I to work in the emergency

department at Centerpoint Medical Center in Independence, Missouri ("Centerpoint"). In 2012, Dr. Brovont was asked if he would be willing to transfer to Overland Park Regional Medical Center in Overland Park, Kansas ("Overland Park"). Dr. Brovont agreed and signed a contract with KS-I to work as Medical Director of Overland Park's emergency department, in charge of the twenty-two physicians who worked in the emergency department at Overland Park as well as all of the emergency department's support staff. One of his duties as Medical Director was to act as the physician liaison between the emergency medicine staff and the rest of the hospital system. He retained his privileges to practice at Centerpoint and also kept his medical license active in Missouri as well as a medical malpractice insurance policy for his work in Missouri. He continued to cover as many clinical shifts at Centerpoint working under the MO-I contract as he could, given his schedule, because he enjoyed working there and supporting that hospital. He also wanted to make sure that if he ever wanted to come back to Centerpoint for any reason he would have that option.

Since 1993, Overland Park had a policy in place setting forth the guidelines for the initiation, management, and evaluation of a Code Blue procedure and for treatment of the patient. At Overland Park, a Code Blue was an urgent distress call, when staff discovered a patient who had stopped breathing or whose heart had stopped functioning, to bring necessary assets to the location to help resuscitate the patient. While Dr. Brovont was the Medical Director of the emergency department at Overland Park, the only doctor assigned to the Code Blue team under the policy was the emergency room doctor. However, for eighteen hours out of each day, Overland Park normally only had one doctor in the

4

emergency room. Between the hours of 3:00 p.m. and 5:00 p.m. and then between 9:00 p.m. and 1:00 a.m. there would usually be two physicians covering the emergency department. All other times of the day there was only one doctor in that department, although there was ancillary help from the nursing staff and physician assistants.

During 2013 and 2014, Overland Park developed a $120 million extensive expansion project that essentially doubled the size of the hospital, tripled the size of the footprint of the emergency department, increased the number of beds in the emergency department from approximately 12 to 24, and added 105 beds to the hospital for a total of 343 licensed beds. The hospital also added a new pediatric emergency room separate from the traditional emergency room.

One of Dr. Brovont's responsibilities as the Medical Director was to review the Code Blue policies and determine their appropriateness. The emergency room physicians expressed concerns to Dr. Brovont that the increased number of patients in the hospital as a whole, the increased size of the emergency department specifically, and the number of patients requiring emergent treatment, all combined with the requirement that doctors leave the emergency department for Code Blue calls in other parts of the hospital to result in the endangerment of patients. Because there was single coverage in the emergency department eighteen hours of each day, whenever the covering physician had to leave for Code Blues in other parts of the hospital, which occurred quite frequently, the emergency room was left unstaffed by a physician. Dr. Brovont represented other physicians in the group, who came to him with their concerns about the requirement that they leave the emergency department for Code Blues, which essentially required them to physically be in potentially

5

three places—in the main emergency room, somewhere else in the 343-bed hospital, and in the pediatric emergency room—leaving the emergency department unattended by a doctor. The physicians felt the Code Blue practice needed to change, particularly in light of the hospital expansion. Dr. Brovont brought these concerns to the attention of the hospital administration and KS-1, expressing concerns for patient safety with the current Code Blue policy.

In December 2015, Dr. McHugh asked Dr. Brovont if he would be willing to consider the site Medical Director position at Centerpoint because of his great success with the team-building experience at Overland Park, accomplished while opening up two freestanding emergency departments and transitioning to a much larger footprint in the new emergency department at the main campus. Dr. Brovont declined the Centerpoint opportunity, wanting to continue developing his position at Overland Park and building team momentum, as well as dealing with the Code Blue policy concerns at Overland Park. The issue regarding emergency department physician staffing did not exist at Centerpoint, since under the Centerpoint Code Blue policy, emergency room physicians did not cover Code Blues outside the emergency room.

In addition to patient safety concerns, Dr. Brovont was concerned about the Overland Park Code Blue policy's compliance with federal law. Overland Park's emergency department was designated as a Level II trauma center. As part of his written contract as Medical Director, Dr. Brovont was required to educate and maintain an emergency department that complied with federal law. The Emergency Medical Treatment and Labor Act ("EMTALA") is a federal law that requires that an emergency room

6

physician be available to make a medical screening exam promptly whenever someone presents to the emergency department, regardless of their insurance status or ability to pay. In the summer of 2016, Dr. Brovont believed that Overland Park was violating EMTALA by not having an emergency room physician available in the emergency department to do a medical screening exam in a timely manner, because the physician was required by the Code Blue policy to be out of the department to respond to a Code Blue in as many as three places at once.

In addition, the American College of Surgeons ("ACS") set forth guidelines to guide the care for traumatically injured patients. A Level II trauma center was required to have a physician in the emergency department at all times. ACS periodically performs on-site surveys at hospitals to determine compliance with the guidelines. Dr. Brovont understood that the guidelines established in 2014 were enforceable and Overland Park needed to comply with them, which encouraged him to advocate for changing the staffing model to expand the number of doctors in the emergency department or get the emergency room physicians off Code Blue responsibility in other parts of the hospital. This is because the staffing model was creating a patient safety issue, with physicians potentially being required to be in other places in the hospital when a traumatically injured or critical care patient arrived in the emergency department. An ACS initial survey in 2015 found Overland Park was noncompliant with these regulations due to the Code Blue policy but allowed it to maintain its status as a Level II trauma center provided that "criteria deficiencies" were addressed. Loss of its status as a Level II trauma center would affect the dispatching of ambulances with trauma patients to the hospital.

7

Dr. McHugh informed Dr. Brovont that the staffing decisions for the emergency department were financially motivated but that he was aware if the staffing model resulted in a bad outcome for a patient, the cost of the bad outcome may exceed the savings. Dr. Brovont agreed to support Dr. McHugh's initial staffing decision, to have emergency room doctors cover both the main emergency room and the pediatric emergency room for the following 90 days. However, near the end of the 90-day period, no staffing policy changes had been made for the main emergency department, the pediatric emergency department, or the Code Blue policy. On July 28, 2016, Dr. Brovont organized a meeting between Dr. McHugh and all of the physicians in the emergency department at Overland Park. At that meeting, he specifically brought up the physicians' concerns about being responsible for responding to Code Blue patients throughout the hospital, requiring them to be in potentially three places at once, the anxiety it was creating for the physicians, and the potential safety issues it was creating with patient care, all of which he expressed were untenable. He specifically discussed the violation of federal law due to the policy. Following this meeting Dr. McHugh sent an e-mail dated July 28, 2016, to all of the emergency department physicians stating in part that "HCA is a for-profit company traded on the New York Stock Exchange. Many of their staffing decisions are financially motivated. EmCare is no different." These statements contained hyperlinks to web sites of each company's stock market and financial information. Following that it stated, "Profits are in everyone's best interest." At the end of the e-mail it stated, "Thank you as well for respecting my request to refrain from publicly voicing your concerns/objections until we are given a fair opportunity to address them." On multiple additional occasions, Dr.

8

Brovont expressed his and the other physicians' concerns regarding the Overland Park Code Blue policy to Dr. McHugh, but no change occurred.

Finally, around the end of September 2016, Dr. Brovont composed a letter expressing his and the rest of the physician group's discomfort with the Code Blue policy and their concerns regarding patient safety issues created by the continued use of the current policy. He circulated a draft of the letter to all of the other physicians in the Overland Park emergency department to make sure that everyone was on board and that they would support him if he submitted the letter on their behalf. All twenty-two of the physicians expressed their agreement with the content of the letter.

On September 30, 2016, Dr. Brovont sent the letter to Dr. McHugh and Dr. Lindsey Bailey ("Dr. Bailey") communicating that the entire group of physicians who provide emergency services at Overland Park were very concerned about the Code Blue policy affecting their ability to provide safe, timely care to their emergency room patients because they were required to be in potentially three places at once. He expressed the growing anxiety that the emergency room physicians were experiencing as a result of the policy as the patient load in the emergency department and the number of Code Blue incidents elsewhere throughout the hospital had significantly increased following the hospital expansion.

Dr. Bailey is a Vice President of EmCare and was also involved with the operation of EmCare subsidiaries in the Kansas City area, including KS-1 and MO-1. Dr. Bailey testified that "this is a pretty stand-up letter for him to write" and that Dr. Brovont

9

"genuinely in his heart cared about the matters of patient safety." She testified that the decision of how to respond to the letter was solely up to Dr. McHugh.

Dr. Brovont did not receive a response to the letter. Later, when Dr. Brovont saw Dr. McHugh in the hallway at Overland Park, Dr. Brovont asked him, "Did you receive the letter I sent?" Dr. McHugh was "very upset" with Dr. Brovont and turned to him and asked, "Why would you ever put that in writing?" Dr. Brovont responded that he "thought it would help him change what we needed to have changed in the emergency department." Six weeks later, KS-I, through Dr. McHugh, terminated Dr. Brovont's employment both as Medical Director and as a clinician.

On January 17, 2017, Dr. Brovont received an email from Dr. McHugh asking to meet the next evening after Dr. Brovont's shift to discuss a few issues. At the meeting, Dr. McHugh told Dr. Brovont that he was not a fit Medical Director to remain at Overland Park and that he was being removed. Dr. McHugh told Dr. Brovont that Kevin Hicks, the CEO of Overland Park, wanted Dr. Brovont removed from the hospital[4] and that the administration had a lot of frustration with Dr. Brovont because the perception was that Dr. Brovont was "not being supportive to the changes there," was "more oppositional than supportive," and that he "ke[pt] fighting against things." Dr. McHugh told Dr. Brovont, "You know you cash the check every month to be a corporate representative, and there is a responsibility as the corporate representative to support the corporation's objectives." Dr. McHugh said that he was going to provide Dr. Brovont with an opportunity to stay in the

---

[4] Dr. Hicks testified that firing Dr. Brovont was Dr. McHugh's idea and decision. Dr. Hicks testified he only reluctantly agreed to have Dr. Brovont terminated after Dr. McHugh assured him that Dr. Brovont would be offered positions at other EmCare hospitals in the Kansas City area.

10

Kansas City area. Dr. McHugh talked with Dr. Brovont about working at Centerpoint Hospital in Missouri, at Liberty Hospital in Missouri, and about a Medical Director position at Golden Valley Hospital in Clinton, Missouri. Dr. Brovont was happy to work at any of these three facilities in Missouri. They also talked about Dr. Brovont taking a contract full-time at Menorah Medical Center in Overland Park, Kansas. That night, Dr. McHugh sent an email to Dr. Eric Stamper, the Director at Menorah, to see if Dr. Brovont could work there, and Dr. Stamper replied, "I would love to have Ray at Menorah."

The following morning, Dr. Brovont sent an email to the human resources director to complain about his removal: "I fear that [Dr. McHugh's] actions are in retaliation for my constant concerns voiced respectfully about patient safety issues. That was part of my job as director. There does not appear to be any other grounds for these actions[.]" The human resources director performed no investigation of the complaint but merely forwarded the communication to Dr. McHugh. After Dr. McHugh saw the email, he determined that he would not allow Dr. Brovont to work anywhere in the MidAmerica Division, which included all of the hospitals in Missouri that he and Dr. Brovont had talked about the previous evening. Even though the only complaints that Dr. Brovont had raised were directed at Overland Park under his contract through KS-I, Dr. McHugh acted upon his anger and prohibited Dr. Brovont from doing any further work for any EmCare hospital in either Kansas or Missouri under either the KS-I or MO-I contracts.

Dr. Brovont sent an email to Dr. McHugh taking him up on his offer to give Dr. Brovont a full-time position at Menorah. But Dr. Brovont did not receive a written contract to perform work at Menorah, and he was never allowed to work at Centerpoint, Liberty, or

11

Golden Valley in Missouri. Dr. Brovont contacted the Medical Director at Centerpoint about returning to work at Centerpoint full-time but was told that he could not be employed without a MO-I contract and that he had no options to work at any HCA facilities in Missouri.

Following Dr. Brovont's termination in both Missouri and Kansas, the remaining emergency room physicians at Overland Park, who worked for KS-I were "petrified," and the environment was described as a "weird cult of coercion" where if you didn't toe the party line "this is what happens to you." Other physicians believed they may "get rid of the whole lot of us," and the result was "complete silence" about the Code Blue policy. Younger physicians were especially afraid to make any complaints because of student loan debt. No change was made to the Code Blue policy, but none of the physicians felt they could continue to express their concerns for patient safety caused by the policy.

Dr. Brovont was unemployed for about three months until he found a job at Providence Medical Center as interim Medical Director from April 15, 2017, to May 1, 2018. Providence Medical Center was not under contract with EmCare or any of its subsidiaries for its emergency department staffing.

On April 27, 2017, Dr. Brovont filed a one-count petition for damages for wrongful discharge in violation of public policy against KS-I and MO-I,[5] alleging that the reason his employment was terminated as Medical Director and emergency room physician was because of his complaints of dangerous and illegal understaffing of the Overland Park

---

[5] A third defendant, Bluejacket Emergency Physicians, LLC was dismissed by Dr. Brovont prior to trial.

emergency department due to the decision to use a single emergency room physician to also cover the responsibilities at the pediatric emergency room as well as to respond to Code Blue incidents throughout the hospital. The jury returned a verdict for compensatory damages in the amount of $2,817,045 in economic damages, and $6 million in non-economic damages jointly and severally against KS-I and MO-I. The jury found that both KS-I and MO-I were liable for punitive damages and awarded $10 million against each defendant. Applying Kansas law, the trial court reduced the amount of certain sums awarded by the jury and entered judgment in favor of Dr. Brovont and against KS-I and MO-I as follows:

Economic damages: $2,817,045 (against defendants, jointly and severally)
Non-economic damages: $300,000 (against defendants, jointly and severally)
Punitive damages: $5 million (against KS-I), $5 million (against MO-I)

On November 5, 2018, Dr. Brovont filed a Motion for a New Trial and/or to Alter or Amend the Judgment. KS-I filed a Motion for Judgment Notwithstanding the Verdict. MO-I also filed a Motion for Judgment Notwithstanding the Verdict. KS-I and MO-I together filed a Motion to Alter or Amend the Judgment and Hold a Mandatory Hearing with Respect to Punitive Damages or, in the Alternative, for Remittitur. KS-I and MO-I also filed a joint Motion for New Trial. On January 31, 2019, the trial court denied each of these post-trial motions.

**Appeal**

KS-I and MO-I timely appealed from the trial court's October 5, 2018 judgment, raising six points of trial court error:

13

(1) The trial court erred in submitting Dr. Brovont's wrongful discharge claim to the jury in that Dr. Brovont failed to establish that the allegedly unsafe emergency department physician-staffing practices violated any public policy concerning emergency department physician staffing;

(2) The trial court erred in denying KS-I's motion for judgment notwithstanding the verdict ("JNOV") because the trial court lacked personal jurisdiction over KS-I;

(3) The trial court erred in submitting a wrongful discharge claim against MO-I to the jury because Dr. Brovont failed to show that he ever complained about any violation of public policy regarding staffing at Centerpoint, that he was discharged by MO-I in retaliation for making any such complaint, or that he was damaged;

(4) The trial court erred in denying KS-I's and MO-I's motion for new trial due to instructional error in instructing the jury to assess joint and several liability against them on a single line on the verdict form;

(5) The trial court erred in submitting the issue of punitive damages against KS-I and MO-I to the jury; and

(6) The trial court erred in not reducing the total punitive damages award to $5 million.

Dr. Brovont timely cross-appealed from the trial court's October 5, 2018 judgment, asserting three points of trial court error:

(1) the trial court erred in applying KAN. STAT. ANN. § 60-19a02 to reduce the jury's verdict for non-economic damages against MO-I because Missouri law applies;

(2) the trial court erred in applying KAN. STAT. ANN. § 60-19a02 to reduce the jury's verdict for non-economic damages against both KS-I and MO-I because the statute has been declared unconstitutional by the Kansas Supreme Court;

(3) the trial court erred in applying KAN. STAT. ANN. § 60-3702(e) to reduce the jury's verdict for punitive damages against MO-I because Missouri law applies.

This court consolidated the two appeals under case number WD82544, and for purposes of Rule 84.04(i), Dr. Brovont, the plaintiff below, was deemed the appellant, and the defendants below were deemed the respondents.

We review the points out of order for ease of analysis.

14

**KS-I's and MO-I's Point II; Missouri Jurisdiction Over KS-1**

In their second point on appeal, KS-I and MO-I assert that the trial court erred in denying KS-I's motion for JNOV because the court lacked personal jurisdiction over KS-I. Specifically, they argue that Dr. Brovont failed to establish that KS-I had sufficient minimum contacts with Missouri or that KS-I had any involvement in Dr. Brovont's employment or discharge from employment in Missouri.

**Standard of Review**

"Whether there has been sufficient evidence presented to make a prima facie showing that a circuit court may exercise personal jurisdiction over a defendant is a question of law that we review *de novo*." *Good World Deals, LLC. v. Gallagher,* 554 S.W.3d 905, 909 (Mo. App. W.D. 2018) (citing *Bryant v. Smith Interior Design Grp., Inc.*, 310 S.W.3d 227, 231 (Mo. banc 2010)). "When a defendant raises a challenge to personal jurisdiction, the plaintiff has the burden of demonstrating that the defendant's contacts with the forum state are sufficient." *Id*. at 909-10.

**Analysis**

"Personal jurisdiction refers quite simply to the power of a court to require a person to respond to a legal proceeding that may affect the person's rights or interests." *State ex rel. Cedar Crest Apartments, LLC v. Grate,* 577 S.W.3d 490, 493 (Mo. banc 2019). "To exercise personal jurisdiction over a non-resident corporation, such an assertion of jurisdiction must be authorized by Missouri's long-arm statute, § 506.500, RSMo 2016, and it must not offend due process." *Id*.

15

"Missouri courts use a two-prong test to determine if personal jurisdiction exists over a nonresident defendant." *State ex rel. PPG Indus., Inc. v. McShane,* 560 S.W.3d 888, 891 (Mo. banc 2018). "First, the out-of-state defendant's conduct must fall within Missouri's long-arm statute, section 506.[5]00." *Id.* (internal quotation marks omitted).

Missouri's long-arm statute provides in relevant part:

Any person or firm, whether or not a citizen or resident of this state, or any corporation, who in person or through an agent does any of the acts enumerated in this section, thereby submits such person, firm, or corporation, and, if an individual, his personal representative, to the jurisdiction of the courts of this state as to any cause of action arising from the doing of any of such acts:
. . . .
(3) The commission of a tortious act within the state[.]

§ 506.500.1(3). "Section 506.500 is construed to extend the jurisdiction of the courts of this state over nonresident defendants to that extent permissible under the Due Process clause." *State ex rel. Key Ins. Co. v. Roldan,* 587 S.W.3d 638, 643 (Mo. banc 2019). "Included in the tortious act section of the long-arm statute are [e]xtraterritorial acts that produce consequences in the state . . . ." *State ex rel. PPG Indus., Inc.,* 560 S.W.3d at 892 (internal quotation marks omitted). Where an agency relationship exists, the wrongful acts of an agent can generally be imputed to the principal. *Cent. Tr. and Inv. Co. v. Signalpoint Asset Mgmt. LLC,* 422 S.W.3d 312, 323 (Mo. banc 2014). Dr. McHugh, acting as an agent on behalf of KS-I, terminated KS-I's employment agreement with Dr. Brovont governing his employment as Medical Director and as an emergency physician providing services at Overland Park. However, at that meeting, McHugh indicated Dr. Brovont was still eligible to work for MO-I and to provide medical services in the emergency departments at any one

of several hospitals in Missouri controlled by EmCare. However, when Dr. McHugh became aware that Dr. Brovont was raising concerns that he was terminated in retaliation for reporting the patient safety issues and regulatory violations by KS-I at Overland Park, Dr. McHugh acting as an agent for KS-I, ensured that MO-I would no longer employ Dr. Brovont at Centerpoint in Missouri and prevented him from working at any other Missouri hospital under contract through MO-I. Dr. McHugh was a dual agent of both KS-I and MO-I, and in that capacity, he had complete control over Dr. Brovont's ability to work for either entity. A principal is responsible for the acts of an agent when the agent is acting with actual authority. *Bach v. Winfield-Foley Fire Prot. Dist.*, 257 S.W.3d 605, 608 (Mo. banc 2008). "Actual authority is authority that the principal has given, either expressly or impliedly, to the agent, empowering the agent to act on the principal's behalf." *Id.*

In their point relied on, KS-I and MO-I do not argue that KS-I's conduct does not fall within the Missouri long-arm statute; instead, they argue that Dr. Brovont failed to establish that KS-I had sufficient minimum contacts with Missouri to satisfy due process. "Once it has been determined the nonresident defendant's conduct is covered under the long-arm statute, the court must then determine whether the defendant has sufficient minimum contacts with Missouri to satisfy due process."[6] *State ex rel. PPG Indus., Inc.,* 560 S.W.3d at 891. "The Due Process Clause requires that a foreign corporation have minimum contacts with the forum state for the forum court to exercise personal jurisdiction over the defendant corporation." *State ex rel. Key Ins. Co.,* 587 S.W.3d at 642-43. "In

---

[6] Some courts use a five-factor test to resolve the ultimate issue whether the defendant has purposely availed itself of the privilege of doing business in Missouri such that it reasonably could anticipate being haled into court here. This five-factor approach is not required. *Bryant*, 310 S.W.3d at 233 n.4.

17

Missouri, '[a] *single tortious act is sufficient* to support personal jurisdiction consistent with due process standards.'" *Id*. at 643 (quoting *State ex rel. William Ranni Assocs., Inc. v. Hartenbach*, 742 S.W.2d 134, 139 (Mo. banc 1987)) (emphasis added). "Further, Missouri courts may still assert personal jurisdiction over a *non-domiciliary defendant corporation without violating due process if that entity has at least one contact* with this state and the *cause of action being pursued arises out of that contact." Id*. at 643 (quoting *State ex rel. Cedar Crest Apartments*, 577 S.W.3d at 494 (internal quotations omitted) (emphasis added). "Although [the defendant's] alleged tort may be its only contact with this state, it is within the bounds of due process to allow Missouri courts to exercise personal jurisdiction over it." *Id.*

Finally, "reasonableness" factors "sometimes serve[] to establish a reasonableness of jurisdiction upon a lesser showing of minimum contacts than would otherwise be required." *Peoples Bank v. Frazee*, 318 S.W.3d 121, 129 (Mo. banc 2010) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985)). These reasonableness factors include "the burden on the defendant, the forum's interest in adjudicating the dispute, and 'the plaintiff's interest in obtaining convenient and effective relief.'" *Id.* (quoting *Burger King Corp.*, 471 U.S. at 477)). "Consideration also must go to 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several States in furthering fundamental substantive social policies.'" *Id.* (quoting *Asahi Metal Indus. Co., Ltd. v. Superior Ct. of Cal., Solano Cnty.*, 480 U.S. 102, 113 (1987)). In this case, reasonableness factors strongly weigh in favor of lessening the required showing for minimum contacts, to the extent that lessening is even required.

18

Brovont's allegations against KS-I and MO-I arise out of the same facts and involve the same agent (McHugh); it is clearly most efficient judicially to hold both actions in a single forum. And as between Missouri and Kansas, Missouri is the more compelling choice. KS-I allegedly acted, through McHugh, in Missouri, causing MO-I to terminate its contract with Brovont as KS-I did. Brovont did not allege that MO-I caused his termination by KS-I, so Kansas would not have personal jurisdiction over MO-I for purposes of these matters in the way that Missouri does over KS-I. In fact, it is unlikely that MO-I's actions would satisfy Kansas's long-arm statute. Allowing these claims to proceed in Missouri is the only way to offer the parties a single forum in which to adjudicate their interwoven disputes. It is also significant that Dr. Brovont was employed by KS-I to serve as Medical Director of the Overland Park Regional Medical Center, located in Overland Park, Kansas less than seven miles from the border between Missouri and Kansas, and within the greater Kansas City metropolitan area which straddles the state line. Because reasonableness factors favor Missouri courts, they serve to lessen the threshold of KS-I's minimum contacts with the State of Missouri sufficient to support the trial court's exercise of personal jurisdiction over KS-I. Next, we examine those contacts.

"A corporation can act only through its agents." *State ex rel. Cedar Crest Apartments., LLC*, 577 S.W.3d at 495. "As a result, a personal jurisdiction analysis will involve (though, usually, only implicitly) imputing the contacts of a defendant corporation's agent(s) to that corporation." *Id.* (citing section 506.500.1 of the long-arm statute, which expressly states jurisdictional acts can be performed "in person or through an agent."). "In some common situations, the legal relationships among parties are

19

ambiguous because it is unclear whether an actor is an agent who acts for one party to a transaction [or] an agent who acts for more than one principal . . . ." RESTATEMENT (THIRD) OF AGENCY, § 3.14 cmt. c (Am. Law Inst. 2006). "The same actor may occupy different roles at successive points in an ongoing interaction among the same parties." *Id.* "An agent who commits a tort may have more than one principal for at least some purposes," and one of these is when the agent is an officer of interrelated entities. *Id.* § 7.03 cmt. d. Although there is a presumption that an agent's actions are attributed to the entity for whom he purports to be acting, even when he acts for multiple principals, the presumption does not apply "when a shared officer's conduct is tortious." *Id.* cmt. d (3).

Dr. McHugh is admittedly an agent of both KS-I and MO-I. At trial, Dr. McHugh testified that "in October of 2015, I took a position with EmCare and I was the executive vice-president of the MidAmerica Division of their Alliance Group, which is a joint venture between EmCare and HCA. So I oversaw a book of business out here that was in— primarily in the Kansas City area, both on the Kansas and Missouri side, as well as Wichita." The evidence plainly established that, Dr. McHugh—acting as the decision-making agent for KS-I, MO-I, and all subsidiary entities of EmCare in the metro Kansas City area—was Dr. Brovont's "boss" and had the authority to terminate his employment with both MO-I and KS-I. While Dr. McHugh told Dr. Brovont that his KS-I termination was requested by Dr. Hicks at Overland Park, every witness with knowledge of the corporate structure testified that Dr. McHugh was the person solely responsible for the decision to terminate Dr. Brovont's employment on both sides of the state line. In fact, it is clear that Dr. McHugh ran MO-I and KS-I in some ways as a single entity. He initially

20

approached Dr. Brovont about leaving his position with Centerpoint in Missouri to go to Overland Park in Kansas when the Medical Director position opened up there.

Dr. McHugh admitted that one of the reasons Dr. Brovont's employment was terminated was because of his complaints regarding Code Blue safety concerns at KS-I. Dr. McHugh also admitted that when Dr. Brovont was removed as Medical Director at Overland Park and from the Overland Park schedule by KS-I, and Dr. Brovont reported to HR that he believed this was in retaliation for raising patient safety concerns, Dr. McHugh eliminated any possibility that Dr. Brovont could work in the future for MO-I. In their opening brief, KS-I and MO-I concede that "Dr. McHugh told [Dr. Brovont] in January 2017 that his employment at [Overland Park] was being terminated" and that Dr. McHugh "took no further action to arrange work for [Dr. Brovont] at either Menorah or Centerpoint," which effectively terminated his employment for MO-I at those hospitals. There was also evidence that without a subsidiary entity (of EmCare) contract, Dr. Brovont had no options to work at any HCA facilities in Missouri. KS-I and MO-I had abdicated all of each company's employment decisions and business decisions to McHugh as their agent, and he was representing the interests of both KS-I and MO-I when he terminated Dr. Brovont's employment with MO-I. As EmCare Vice President in charge of the subsidiary entities in the Kansas City area, Dr. McHugh made decisions relating to physician staffing operations in both Kansas and Missouri. Dr. McHugh acted as KS-I's agent in terminating Dr. Brovont's employment at Overland Park because of his complaints about the hospital's Code Blue policy, and those complaints, as well as later complaints

21

regarding Dr. Brovont's employment at Overland Park, motivated Dr. McHugh to terminate Dr. Brovont's employment in Missouri under the MO-I contract.

There was also evidence that KS-I received a direct benefit from Dr. Brovont's termination by MO-I. Prior to that termination, all twenty-two emergency department physicians employed by KS-I were unanimously raising concerns regarding patient safety at Overland Park. Following the termination that "uprising" was quelled and the result was "complete silence," and those physicians were "petrified" by the "weird cult of coercion." It was made clear that if a doctor complained, he or she would not be allowed to work at any hospital emergency department contracted with EmCare in either Kansas or Missouri, potentially requiring the physician to move his or her family to find future employment.

There was no evidence that MO-I would have terminated Dr. Brovont's services had he not raised the concerns about patient safety regarding KS-I at Overland Park. In fact, Dr. McHugh specifically informed him that he was still eligible to work for any one of several hospitals in Missouri at the same time he was terminated by KS-I. It was only after Dr. Brovont raised additional concerns about the reasons for his termination at KS-I, that Dr. McHugh, acting as an agent of both KS-I and MO-I, decided also to terminate any possibility of Dr. Brovont working for MO-I. There was sufficient evidence to reach a conclusion that Dr. McHugh's action in terminating Dr. Brovont's employment under the MO-I contract was substantially motivated by a desire to discourage the other doctors at Overland Park from making further complaints regarding the Code Blue policy, and that action had direct consequences in the State of Missouri. An agent of two principals may be found to be acting on behalf of a principal who benefits from the agent's actions, even

22

when the agent purports to be acting on behalf of the other principal. *See Bishop v. Miller*, 412 S.W.3d 758, 772-73 (Tex. App. 2013) (agent's tort found attributable to the subsidiary entity benefitting from the agent's action, even though the agent purported to be acting only on behalf of the parent entity, for which he was also an agent). KS-I's benefit from Dr. McHugh's termination of Dr. Brovont from MO-I in Missouri supports the conclusion that McHugh was acting on behalf of both KS-I and MO-I when Dr. Brovont's contract with MO-I was terminated, and this single tortious act is a sufficient minimum contact of KS-I with the State of Missouri to support the trial court's exercise of personal jurisdiction over KS-I in this case.

**Conclusion**

KS-I and MO-I's Point II is denied.

**Dr. Brovont's Point I and II – Application of KAN. STAT. ANN.§ 60-19a02**

In Dr. Brovont's first and second points, he asserts that the trial court erred in applying KAN. STAT. ANN.§ 60-19a02 to reduce the jury's verdict for non-economic damages against KS-I and MO-I. In KS-I and MO-I's opening brief, they concede Dr. Brovont's Points I and II stating:

> Although [KS-I and MO-I] disagree that Missouri law applies, the argument [in Dr. Brovont's Point I] is now immaterial because [KS-I and MO-I] agree that, as [Dr. Brovont] argues in his Point II, the Kansas Supreme Court's post-trial decision in *Hilburn* [*v. Enerpipe, Ltd.,* 442 P.3d 509 (Kan. 2019),] abrogating Kansas's non-economic damages cap now controls and destroys the prior conflict between Missouri and Kansas law.[7]

---

[7] In *Hilburn,* the Kansas Supreme Court concluded that the effect of the non-economic damages cap in KSA § 60-19a02:

> is to disturb the jury's finding of fact on the amount of the award. Allowing this substitutes the Legislature's nonspecific judgment for the jury's specific judgment. The people deprived the

"An appellate court must decide a case on the basis of the law in effect at the time of the appellate decision." *Harper v. Harper*, 4 S.W.3d 626, 629 (Mo. App. S.D. 1999) (quoting *Sturgess v. Guerrant*, 583 S.W.2d 258, 262 (Mo. App. W.D. 1979)). "An unconstitutional statute is no law and confers no rights. This is true from the date of its enactment, and not merely from the date of the decision so branding it." *Trout v. State*, 231 S.W.3d 140, 148 (Mo. banc 2007) (quoting *State ex rel. Miller v. O'Malley*, 117 S.W.2d 319, 324 (Mo. banc 1938) (citing *Norton v. Shelby Cnty.*, 118 U.S. 425, 442, (1886)). "Solely prospective application of a decision is the exception not the norm because it involves judicial enforcement of a statute after the statute has been found to violate the Constitution and to be void and without effect *ab initio*." *Id.* (citing *State ex rel. Cardinal Glennon Mem'l Hosp. for Child. v. Gaertner*, 583 S.W.2d 107, 118 (Mo. banc 1979)).

Dr. Brovont's Points I and II are granted. Because the Kansas statute upon which the trial court relied to reduce the jury's verdict for non-economic damages from $6 million to $300,000 was declared unconstitutional by the Kansas Supreme Court's decision in *Hilburn* (after the trial court's judgment), that portion of the trial court's judgment for non-economic damages in favor of Dr. Brovont and against KS-I and MO-I, jointly and

---

Legislature of that power when they made the right to trial by jury inviolate. Thus we hold that the cap on damages imposed by K.S.A. 60-19a02 is facially unconstitutional because it violates section 5 of the Kansas Constitution Bill of Rights.

*Hilburn v. Enerpipe, Ltd.,* 442 P.3d 509, 524 (Kan. 2019).

24

severally, in the amount of $300,000, is reversed and the jury's verdict in the amount $6 million is reinstated.

**Dr. Brovont's Point III – Application of KAN. STAT. ANN. § 60-3702(e)**

In Dr. Brovont's third point, he asserts that the trial court erred in applying KAN. STAT. ANN.§ 60-3702(e) to reduce the jury's verdict for punitive damages against MO-I because Missouri law applies. Specifically, Dr. Brovont contends that there is no true conflict between Missouri law and Kansas law on the issue of punitive damages against MO-I, and Missouri has the greater governmental interest in applying its law to the issue of punitive damages against MO-1.

**Standard of Review**

"The question of which State's law to apply is . . . a question of law, subject to *de novo* review." *Rider v. Young Men's Christian Ass'n of Greater Kan. City,* 460 S.W.3d 378, 388 (Mo. App. W.D. 2015).

**Analysis**

The question before the court is whether the jury's award of $10 million in punitive damages against MO-I was properly capped by the trial court at $5 million by applying KAN. STAT. ANN.§ 60-3702(e). In resolving a conflict-of-law issue, the court must determine whether it is a true or false conflict.

"A false conflict of laws exists when the policy of the foreign jurisdiction would not be advanced by application of its law because there is no resident of the foreign jurisdiction before the court who would benefit from the foreign jurisdiction's law." *Colonial Presbyterian Church v. Heartland Presbytery,* 375 S.W.3d 190, 199 (Mo. App. W.D.

25

2012).  It is arguable that a false conflict of laws exists here because the only resident of Kansas involved in this claim of punitive damages against MO-I is Dr. Brovont, and he does not benefit from the application of the Kansas statutory cap on punitive damages.

The true conflict of laws here (if there is one) is a conflict between Missouri punitive damage law and Kansas punitive damage law.  In relevant part, KAN. STAT. ANN. § 60-3702(e) provides that no award of exemplary or punitive damages shall exceed $5 million.  In contrast, the Missouri statutory cap on punitive damages has been declared by the Missouri Supreme Court to violate the constitutional right to a jury trial.  *Lewellen v. Franklin,* 441 S.W.3d 136, 145 (Mo. banc 2014) (holding that "the punitive damages cap in section 510.265 'curtails the jury's determination of damages and, as a result, necessarily infringes on the right to a trial by jury when applied to a cause of action to which the right to jury trial attaches at common law'").

To the extent a case presents a true conflict of laws issue, Missouri courts use the most significant relationship test to resolve the issue.  *Colonial Presbyterian Church,* 375 S.W.3d at 200.  The most significant relationship test Missouri employs for conflicts of law related to tort claims is set forth in Restatement (Second) of Conflict of Laws § 145 (1971).  *Zafer Chiropractic & Sports Injs., P.A. v. Hermann,* 501 S.W.3d 545, 550 (Mo. App. E.D. 2016) (citing *Reis v. Peabody Coal Co.*, 997 S.W.2d 49, 58 (Mo. App. E.D. 1999)).  Section 145 states:

> (1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6.

26

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
    (a) the place where the injury occurred,
    (b) the place where the conduct causing the injury occurred,
    (c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and
    (d) the place where the relationship, if any, between the parties is centered.

"These contacts are to be evaluated according to their relative importance with respect to the particular issue." *Zafer*, 501 S.W.3d at 550.

*The place where the injury occurred was Missouri:* MO-I had an employment contract with Dr. Brovont governing his provision of emergency medical services at Centerpoint Medical Center located in Independence, Missouri. When Dr. Brovont's employment was terminated at MO-I, he could no longer work for any subsidiary in the MidAmerica Division of EmCare, which included all of the hospitals in Missouri staffed by EmCare.

*The place where the conduct causing the injury occurred in Missouri.* MO-I had an employment contract with Dr. Brovont governing his provision of emergency medical services at Centerpoint Medical Center located in Independence, Missouri. When Dr. Brovont's employment was terminated by MO-1, he could no longer work for any subsidiary in the MidAmerica Division of EmCare, which included all of the hospitals in Missouri staffed by EmCare.

*The domicile, residence, nationality, place of incorporation and place of business of the parties is Missouri.* MO-I is a limited liability company organized under the laws of the State of Missouri with its principal place of business located in the State of Missouri.

27

While Dr. Brovont is a resident of Kansas, he had an employment contract with MO-I to provide emergency medical services at Centerpoint Medical Center located in Independence, Missouri.

*The place where the relationship, if any, between the parties is centered is in Missouri.* Dr. Brovont had an employment contract with MO-I to provide emergency medical services at Centerpoint Medical Center located in Independence, Missouri. When Dr. Brovont's employment was terminated by MO-1, he could no longer work for any subsidiary in the MidAmerica Division of EmCare, which included all of the hospitals in Missouri staffed by EmCare.

After considering all four factors, Missouri has the most significant relationship to Dr. Brovont's claim against MO-I.

MO-I and KS-I argue that Kansas has the most significant relationship to the issues in this case because Dr. Brovont is a Kansas resident and the sole basis for his verdict-directing instruction against MO-I was his complaints about the unsafe practices at Overland Park in Kansas. In a situation where two states have significant contacts and legitimate state interests in the choice of law, a court must undertake a "government interest" analysis and "apply the law of the state whose interest would be more impaired if its policy were subordinated to the policy of the other state." *Gilmore v. Attebery,* 899 S.W.2d 164, 167 (Mo. App. W.D. 1995) (citing *Hicks v. Graves Truck Lines, Inc.*, 707 S.W.2d 439, 445 (Mo. App. W.D. 1986)). The imposition of punitive damages furthers a state's legitimate interests in punishing unlawful conduct and deterring its repetition. *Blanks v. Fluor Corp.,* 450 S.W.3d 308, 409 (Mo. App. E.D. 2014) (citing *BMW of N. Am.,*

28

*Inc. v. Gore*, 517 U.S. 559, 568 (1996); *Letz v. Turbomeca Engine Corp.,* 975 S.W.2d 155, 177 (Mo. App. W.D. 1997)). MO-I is a Missouri company that contracted with physicians in Missouri. Dr. McHugh's decision to terminate Dr. Brovont's employment agreement with MO-I directly impacted Dr. Brovont's Missouri employment to his detriment. Missouri has a legitimate interest in punishing and deterring Missouri companies from wrongfully discharging their employees for "whistleblowing." Applying the governmental interest analysis to the instant case, Missouri's interest would be more impaired if Kansas law were applied.

**Conclusion**

Dr. Brovont's Point III is granted. The trial court erred in applying Kansas law to cap Dr. Brovont's punitive damages claim against MO-I. That portion of the trial court's judgment awarding punitive damages in favor of Dr. Brovont and against MO-I in the amount of $5 million is reversed, and the jury's verdict in the amount of $10 million is reinstated.

**KS-I and MO-I's Point I – Submissibility of Wrongful Discharge Claim**

In their first point on appeal, KS-I and MO-I assert that the trial court erred in submitting Dr. Brovont's wrongful discharge claim to the jury because Dr. Brovont failed to establish that the allegedly unsafe emergency department physician-staffing practices violated any public policy concerning emergency department physician staffing.

**Standard of Review**

"A case may not be submitted unless each and every fact essential to liability is predicated on legal and substantial evidence." *Ellison v. Fry,* 437 S.W.3d 762, 768 (Mo.

29

banc 2014). "Whether the plaintiff made a submissible case is a question of law that this Court reviews *de novo*." *Id*. "Evidence is viewed in the light most favorable to the jury's verdict, giving the plaintiff all reasonable inferences and disregarding all conflicting evidence and inferences." *Newsome v. Kan. City, Mo., Sch. Dist.*, 520 S.W.3d 769, 775 (Mo. banc 2017).

**Analysis**

Generally, an at-will employee can be discharged for any reason or no reason. *Fleshner v. Pepose Vision Inst., P.C.*, 304 S.W.3d 81, 91 (Mo. banc 2010). The Missouri Supreme Court has expressly adopted the following public policy exception to the at-will employment doctrine: "An at-will employee may not be terminated (1) for refusing to violate the law or any well-established and clear mandate of public policy as expressed in the constitution, statutes, regulations promulgated pursuant to statute, or rules created by a governmental body or (2) for reporting wrongdoing or violations of law to superiors or public authorities." *Id*. at 92.[8] "If an employer terminates an employee for either reason, then the employee has a cause of action in tort for wrongful discharge based on the public-policy exception." *Id*. The wrongful-discharge doctrine applies to both at-will and contract employees. *Keveney v. Mo. Mil. Acad*., 304 S.W.3d 98, 103 (Mo. banc 2010).

"The public policy exception to the at-will employment rule, often called the wrongful discharge doctrine, is very narrowly drawn." *Margiotta v. Christian Hosp. Ne.*

---

[8] The Kansas Supreme Court has also recognized the public-policy exception to the employment-at-will doctrine, and Kansas law also recognizes a remedy in tort. *See Palmer v. Brown*, 752 P.2d 685 (Kan. 1988); *Goodman v. Wesley Med. Ctr., LLC*, 78 P.3d 817 (Kan. 2003). Kansas law also requires that the public policy the employee complains of be "thoroughly established." *Goodman*, 78 P.3d at 823. The result of Dr. Brovont's wrongful discharge claim against KS-I would not differ based on the application of either Missouri or Kansas law.

30

*Nw*., 315 S.W.3d 342, 346 (Mo. banc 2010). There are two distinct categories: "(1) refusal to violate public policy; and (2) reporting violations of public policy, also known as 'whistleblowing.'" *Newsome*, 520 S.W.3d at 777. A whistleblower must demonstrate that: "(1) he reported serious misconduct that constituted a violation of the law and of well-established and clearly mandated public policy to his superiors; (2) the employer terminated his employment; and (3) there is a causal connection between his reporting and his termination." *Van Kirk v. Burns & McDonnell Eng'g Co.,* 484 S.W.3d 840, 844-45 (Mo. App. W.D. 2016). "The whistleblowing need only be a contributing factor and need not be the exclusive cause of the termination." *Id*. at 845.

KS-I and MO-I concede in their brief that "[f]rom the time [Dr. Brovont] began his Kansas employment at [Overland Park] in 2012, [he] repeatedly expressed dissatisfaction about that hospital's ER staffing policy," and that his "supervisors routinely transmitted complaints from [Dr. Brovont] and other ER doctors about ER staffing to [Overland Park's] management." KS-I and MO-I also concede that Dr. McHugh terminated Dr. Brovont's employment. Dr. McHugh admitted that Dr. Brovont's complaints about Overland Park's Code Blue policy contributed to his discharge: "One of the reasons that [Dr. Brovont] was let go was his unprofessional behavior and the way he communicated things, which may have included what I believe were inaccurate statements regarding safety."

Instead, KS-I and MO-I argue that Dr. Brovont's complaint that Overland Park's emergency room staffing policies were "unsafe"—(1) from 11 p.m. to 11 a.m., a single physician assigned to the main emergency room was also responsible for covering the pediatric emergency room, and (2) the same physician was also required to respond to

31

"Code Blues" throughout the hospital—was merely his "subjective belief" and not prohibited by any "well established and clearly mandated public policy."

It is essential that a reported act violated public policy, not merely that the plaintiff so believed, even if his belief was reasonable. *Newsome*, 520 S.W.3d at 779. "Whether a reported act violated public policy is a legal question for the trial court in determining whether the plaintiff has made a *prima facie* case." *Yerra v. Mercy Clinic Springfield Communities,* 536 S.W.3d 348, 351 (Mo. App. S.D. 2017) (citing *Newsome*, 520 S.W.3d at 779)). "In other words, only after the circuit court decides an act constitutes a violation of public policy as reflected by a constitutional provision, statute, regulation promulgated pursuant to statute, or a rule created by a governmental body, may the circuit court then submit an instruction to the jury based on the act." *Id*. (citation omitted) (internal quotation marks omitted).

Dr. Abookire testified as an expert that all Level I and Level II trauma centers are required by Federal regulations to have a physician in the emergency department at all times to respond to patients who come in with a trauma. As a level II trauma center, a physician needed to be present in the emergency department when a traumatically injured or critical care patient arrived in the emergency department. Dr. Brovont testified "EMTALA requires that the emergency room physician be available to make a medical screening exam whenever anybody presents to the emergency department." With regard to EMTALA, Dr. Brovont was concerned that "our adherence to the Code Blue policy . . . would take us out of the emergency department so we would physically not be available to provide a medical screening exam." He testified: "I believed, and I felt, that we were

32

violating EMTALA by not being available in the emergency department to do a medical screening exam in a timely manner. Because we were required by policy to be out of the department to respond to a Code Blue and be in three places at once."

In addition, the American College of Surgeons ("ACS") set forth the guidelines to care for the traumatically injured patient. A Level II trauma center was required to have a physician in the emergency department at all times. Dr. Brovont understood that the guidelines established in 2014 were enforceable, and Overland Park needed to comply with them. He was advocating to change the staffing model to get the emergency room physicians off Code Blue responsibility in other parts of the hospital because it was a patient safety issue, with physicians potentially being required to be in other places in the hospital when a traumatically injured or critical care patient arrived in the emergency department. ACS periodically performs on-site surveys at hospitals to determine compliance with the guidelines. An ACS initial survey in 2015 found Overland Park noncompliant with these regulations due to the Code Blue policy but allowed it to maintain its status as a Level II trauma center provided that "criteria deficiencies" were addressed. As of the time of Dr. Brovont's termination, they had not been addressed.

Missouri has a long history of allowing whistleblowers to proceed to trial under the public policy exception for accusations that a hospital violated standards of medical procedure, like the Nursing Practice Act ("NPA"). *See Farrow v. Saint Francis Med. Ctr.,* 407 S.W.3d 579 (Mo. banc 2013) (nurse sued the hospital alleging wrongful discharge for her objections and refusal to follow hospital's directive to have non-nurses administer peripherally inserted central catheter (PICC) lines in violation of the NPA; *Hughes v.*

33

*Freeman Health Sys.*, 283 S.W.3d 797 (Mo. App. S.D. 2009) (nurse sued the hospital alleging wrongful discharge for failing to follow directives that would have been contrary to the NPA by refusing to alter her progress notes that criticized a physician's action); *Kirk v. Mercy Hosp. Tri-Cnty.*, 851 S.W.2d 617 (Mo. App. S.D. 1993) (nurse sued the hospital alleging wrongful discharge, in violation of the NPA's mandate of public policy that nurses have duty to provide best possible care for patients, for informing a patient's family about a doctor's failure to timely treat a patient with antibiotics for an infection that caused the patient's death); *Yerra*, 536 S.W.3d at 355 (Rahmeyer, J., dissenting).

Dr. Brovont established each element of his whistleblower claim, and the trial court did not err in submitting his wrongful-discharge claim to the jury.

**Conclusion**

KS-I and MO-I's Point I is denied.

### KS-I and MO-I's Point III – Submissibility of Wrongful Discharge Claim Against MO-I

In their third point, KS-I and MO-I allege that the trial court erred in submitting a wrongful discharge claim against MO-I to the jury because Dr. Brovont failed to show that he ever complained about any violation of public policy regarding staffing at Centerpoint, that he was discharged by MO-I in retaliation for making any such complaint, or that he was damaged. In essence, KS-I's and MO-I's argument is that because Dr. Brovont did not make his complaint about actions occurring in Missouri, MO-I cannot be liable for his discharge.

34

In *Van Kirk,* 484 S.W.3d at 845, Van Kirk worked on Burns's Frontier Boiler Project in Wyoming and Texas. He reported to his superiors that Burns was violating the prohibition against licensed engineers assisting non-licensed engineers in the unlawful practice of engineering. *Id.* He alleged that he was terminated for reporting violations of the clearly-established and fundamental public policy requiring that engineering work be done only under the direct and active supervision of a licensed engineer and that drawings and other related engineering documents be properly sealed by licensed engineers. *Id.*

Burns argued that Van Kirk's allegations were insufficient to support a whistleblowing claim because he was relying on violations of Wyoming and Texas law to create a Missouri wrongful discharge claim. *Id*. This court disagreed. We found that Van Kirk's references to the laws of other states where some of the unauthorized practice of engineering was allegedly performed did not mean that his wrongful discharge claim was based on Wyoming and Texas law. *Id*. We found that the public policy that Burns allegedly violated was also found in Missouri regulations, which contained no geographical limitation on its prohibition against licensed engineers assisting non-licensed engineers in the unlawful practice of engineering. *Id*. at 845-46. Accordingly, "Van Kirk's claim is simply that, when read together, [Missouri regulations] prohibit licensees from assisting non-licensees in the practice of engineering in Missouri and in other jurisdictions." *Id*. at 846. Here, the public policy was established by EMTALA, a federal law applicable in every jurisdiction, including both Missouri and Kansas.

KS-I and MO-I further argue that Dr. Brovont could not make a submissible case against MO-I because he did not complain that anyone at MO-I violated any public policy.

35

However, Dr. McHugh was the executive vice-president of the Mid-America Division of EmCare, was the managerial agent of both KS-I and MO-I, and clearly served as Dr. Brovont's boss for his employment in both corporations. Dr. Brovont made his protected complaints about the Overland Park Code Blue policy to Dr. McHugh. Dr. McHugh, as the dual agent of both KS-I and MO-I, not only terminated Dr. Brovont's employment at Overland Park working for KS-I in retaliation for his whistleblowing complaints but also prevented him from working anywhere in the MidAmerica Division, which included the hospitals in Missouri staffed by subsidiaries of EmCare including MO-I.

Finally, KS-I and MO-I argue that there was no evidence that Dr. Brovont was economically damaged in Missouri. The record shows that after Dr. McHugh terminated Dr. Brovont from his position at Overland Park working for KS-I, Dr. McHugh talked with Dr. Brovont about working at Centerpoint, at Liberty Hospital, and about a Medical Director position or a leadership position at Golden Valley Hospital in Missouri. Dr. Brovont was willing to work at any of those locations. However, the next day when Dr. McHugh was notified that Dr. Brovont was alleging his termination by KS-I was done with a retaliatory intent, Dr. McHugh refused to allow Dr. Brovont to work for MO-I anywhere in the MidAmerica Division, which included all of the hospitals in Missouri that he and Dr. Brovont had discussed and at which he would have been eligible to work as a result of his employment with MO-I. Dr. Brovont had also continued to cover as many clinical shifts at Centerpoint as his schedule allowed after he took the position at Overland Park so that he could keep his foot in the door there. This ended after Dr. McHugh terminated his

36

contract with MO-I. This constitutes substantial evidence that Dr. Brovont sustained damages in the state of Missouri as a result of his protected activity.

Because Dr. Brovont's complaint about the Overland Park Code Blue policy directly resulted in termination of his employment in Missouri, Dr. Brovont made a submissible wrongful-discharge case against MO-I.

**Conclusion**

KS-I and MO-I's Point III is denied.

## KS-I and MO-I's *Point IV* – Instructional Error

In their fourth point, KS-I and MO-I alleged that the trial court erred in denying KS-I and MO-I's motion for new trial due to instructional error in instructing the jury to assess joint and several liability against them on a single line on the verdict form.

**Standard of Review**

"Whether a jury was properly instructed is a question of law that [we] review[ ] *de novo*." *Wynn v. BNSF Ry. Co.,* 588 S.W.3d 907, 911 (Mo. App. W.D. 2019) (internal quotation marks omitted).

**Analysis**

Rule 70.02(b) provides: "Whenever Missouri Approved Instructions contains an instruction applicable in a particular case that the appropriate party requests or the court decides to submit, such instruction shall be given to the exclusion of any other instructions on the same subject." In other words, "Where an applicable MAI exists, its use is mandatory." *Lewellen v. Universal Underwriters Ins. Co.,* 574 S.W.3d 251, 279 (Mo. App. W.D. 2019).

MAI 36.12 [1980 Revision] is the approved verdict director for "Plaintiff vs. Two

Defendants--Actual and Punitive Damages":

VERDICT _____ [1]

Note:
    Complete this form by writing in the names required by your verdict.

    On the claim of plaintiff *(state the name)* for personal injuries[2] against defendant *(state the name of one defendant)*, we, the undersigned jurors, find in favor of:

_____

  (Plaintiff *(state the name)*)       or        (Defendant *(state the name)*)

    On the claim of plaintiff *(state the name)* for personal injuries[2] against defendant *(state the name of the other defendant)*, we, the undersigned jurors, find in favor of:

_____

  (Plaintiff *(state the name)*)       or        (Defendant *(state the name)*)

    Note:  Complete the following paragraph only if one or more of the above findings is in favor of plaintiff *(state the name)*.

    We, the undersigned jurors, assess the damages of plaintiff *(state the name)* as follows:

    For actual damages $_____ *(stating the amount)*.

    For punitive damages against defendant *(state the name)*[3] $_____ *(stating the amount or, if none, write the word, "none")*.

    For punitive damages against defendant *(state the name)*[3] $_____ *(stating the amount or, if none, write the word, "none")*.[4]

Note:
    All jurors who agree to the above must legibly sign or print their names below.

_____  _____
_____  _____
_____  _____
_____  _____

Here, Verdict form A was a modification of MAI 36.12:

VERDICT A

Note: Complete this form as required by your verdict.

On the claim of plaintiff Brovont for compensatory damages for wrongful discharge against defendant KS-I Medical Services, P.A., we, the undersigned jurors, find in favor of:

_____
Plaintiff Raymond Brovont OR Defendant KS-I

On the claim of plaintiff Brovont for compensatory damages for wrongful discharge against defendant MO-I Medical Services, LLC, we, the undersigned jurors, find in favor of:

_____
Plaintiff Raymond Brovont OR Defendant MO-I

Note: Complete the following paragraph only if one or more of the above findings is in favor of plaintiff Raymond Brovont.

We, the undersigned jurors, assess the compensatory damages of plaintiff Raymond Brovont as follows:

For economic damages: $_____

For non-economic damages: $_____

Note: If you found in favor of plaintiff Raymond Brovont and against defendant KS-I Medical Services, P.A., complete the following paragraph by writing in the word(s) required by your verdict.

We, the undersigned jurors, find that defendant KS-I:
_____ ("is" or "is not")
liable for punitive damages.

Note: If you found in favor of plaintiff Raymond Brovont and against defendant MO-I Medical Services, LLC, complete the following paragraph by writing in the word(s) required by your verdict.

We, the undersigned jurors, find that defendant MO-I:
_____ ("is" or "is not")
liable for punitive damages.

Note: All jurors who agree to the above findings must sign below.

_____    _____
_____    _____
_____    _____
_____    _____
_____    _____
_____
Plaintiff's Proposed Verdict Form A
MAI 35.19, 36.12 (modified), 36.21 (modified)
Submitted by plaintiff

39

In *Chambers v. McNair,* 692 S.W.2d 320, 324 (Mo. App. E.D. 1985), separate verdict forms patterned after MAI 36.01 were submitted for each of two defendants rather than a single form patterned after MAI 36.12. "As a result, the jury awarded actual damages separately against each defendant in a case where the defendants were, at most, joint tort feasors." *Id*. The judgment, in accordance with the verdict, was for a separate sum against each defendant. *Id*. According to the court, "the separate verdicts for actual damages are a duplication of one another." *Id.* "This was error as a matter of law since there can be 'but one final judgment in the cause, and a judgment against joint tort-feasors must be for a single amount and cannot be split up.'" *Id*. (quoting *Polkowski v. St. Louis Pub. Serv. Co*., 68 S.W.2d 884, 889 (Mo. App. 1934)). The court noted:

> that Missouri's rule as to compensatory damages in tort actions is that "[a]ll who are guilty of participating in the wrongdoing are jointly and severally liable for the whole damage, and the judgment must be in one amount and against all who are not discharged." *State ex rel. Hall v. Cook*, 400 S.W.2d 39, 40[2] (Mo. banc 1966).

*Id.* (quoting *Linkogel v. Baker Protective Servs., Inc.*, 626 S.W.2d 380, 387 (Mo. App. E.D. 1981)). Accordingly, "[t]he use of separate verdict directors is permissible but not separate forms where, as here, there are not varying degrees of culpability." *Id.*

"Joint and several liability occurs where the concurrent or successive negligent acts or omissions of two or more persons, although acting independently of each other, are, in combination, the direct and proximate cause of a single injury to a third person, and it is impossible to determine in what proportion each contributed to the injury." *Bell v. Redjal,* 569 S.W.3d 70, 100 (Mo. App. E.D. 2019) (quoting *Sanders v. Ahmed*, 364 S.W.3d 195, 212 (Mo. banc 2012)). "In other words, joint tortfeasors are two or more defendants whose

40

alleged tortious conduct causes an indivisible injury to the plaintiff within the same transaction of facts." *Id.* (citing *Stevenson v. Aquila Foreign Qualifications Corp.*, 326 S.W.3d 920, 925 (Mo. App. W.D. 2010)). "An indivisible injury occurring in a single transaction of facts is readily distinguishable from instances in which one injury occurs and the negligence of an independent tortfeasor aggravates the initial injury." *Id.* (citing *Sanders*, 364 S.W.3d at 212). KS-I and MO-I acted in combination through their dual agent, Dr. McHugh, to cause Dr. Brovont indivisible injuries (lost wages, emotional distress) by acting through Dr. McHugh to terminate Dr. Brovont's Kansas and Missouri employment within the same transaction of facts.

The trial court did not err in using MAI 36.12 as the verdict form to submit the issue of compensatory damages to the jury.

**Conclusion**

KS-I and MO-I's Point IV is denied.

**KS-I and MO-I's Point V – Submissibility of Punitive Damages**

In their fifth point, KS-I and MO-I alleged that the trial court erred in submitting the issue of punitive damages against KS-I and MO-I. They argue that there was no substantial evidence that either KS-I or MO-I exhibited the necessary evil motive or reckless indifference.

**Standard of Review**

A submissible case for punitive damages requires clear and convincing proof that the defendant intentionally acted either by a wanton, willful or outrageous act, or reckless

disregard for an act's consequences (from which evil motive is inferred). The defendant must have intentionally committed a wrongful act without just cause or excuse.

> Whether there is sufficient evidence to support an award of punitive damages is a question of law. We review the evidence presented to determine whether, as a matter of law, it was sufficient to submit the claim for punitive damages. In doing so, we view the evidence and all reasonable inferences in the light most favorable to submissibility. A submissible case is made if the evidence and the inferences drawn therefrom are sufficient to permit a reasonable juror to conclude that the plaintiff established with convincing clarity--that is, it was highly probable--that the defendant's conduct was outrageous because of evil motive or reckless indifference.

*Mignone v. Mo. Dep't of Corr.,* 546 S.W.3d 23, 41 (Mo. App. W.D. 2018) (quoting *Howard v. City of Kan. City*, 332 S.W.3d 772, 788 (Mo. banc 2011)).

**Analysis**

In this case, the evidence viewed in the light most favorable to submissibility shows that one of Dr. Brovont's responsibilities as the Medical Director at Overland Park was to review the Code Blue policies and determine if they are appropriate or not. The emergency department physicians as a whole felt that the increased patients resulting from the expansion project that essentially doubled the size of the hospital, and the expectation of being in two or sometimes three places at once, given that the emergency department was very busy with a high acuity level, was endangering the patients. Given that there was single physician coverage eighteen hours of the day in a level II trauma center, when that physician had to leave for Code Blues, which occurred quite frequently, the emergency room was being left unstaffed. The other physicians Dr. Brovont represented in the group came to him with their concerns and anxiety about the requirement to leave the emergency department for Code Blues, because (particularly after the opening of the pediatric

42

emergency room) they had to physically be potentially in three places: in the main emergency department, somewhere in the 343-bed hospital, or in the pediatric emergency department. The physicians felt the Code Blue practice needed to change in the interests of patient safety. Dr. Brovont brought to administration his concerns about patient safety involving the single emergency department physician being required to leave the emergency department unattended by a doctor so the doctor could respond to Code Blues in the hospital or in the pediatric emergency department.

Dr. McHugh discouraged emergency room physicians from voicing concerns about the Code Blue policy in connection with the opening of the pediatric emergency department, even though he admitted that "nightmare scenarios occasionally occur. Anyone of us could imagine a shift where the main ED is crushed, a critical trauma is inbound, and a crumping kid hits the pediatric ED." He also admitted that the requirement for cross coverage was motivated by financial concerns—to prevent Overland Park administration from reducing the main emergency department staffing to offset the cost associated with 24/7 staffing of the pediatric emergency department. He acknowledged that staffing decisions of EmCare subsidiaries KS-I and MO-I were financially motivated.

In retaliation for Dr. Brovont's repeated complaints about the Code Blue policy, Dr. McHugh terminated Dr. Brovont's employment at Overland Park. And after Dr. Brovont sent an email to the human resources director to complain about his termination, Dr. McHugh further retaliated by refusing to allow Dr. Brovont to work anywhere in the MidAmerica Division, which included all of the hospitals in Missouri that subsidiaries of EmCare staffed. As Dr. McHugh told Dr. Brovont: "You know you cash the check every

43

month to be a corporate representative and there is a responsibility as the corporate representative to support the corporation's objectives." As a result of Dr. Brovont's refusal to stay silent when patient safety was significantly at risk at Overland Park, Dr. McHugh, acting as the dual agent of both companies terminated Dr. Brovont from both KS-I and MO-I.

Further, Dr. Brovont's termination at MO-I had the desired chilling effect on the other doctors working for KS-I. Following Dr. Brovont's termination in both Missouri and Kansas the remaining emergency room physicians at Overland Park, who worked for KS-I were "petrified" and the environment was described as a "weird cult of coercion" where if you didn't toe the party line "this is what happens to you." Other physicians believed they may "get rid of the whole lot of us" and the result was "complete silence" about the Code Blue policy. Younger physicians were especially afraid to make any complaints because of student loan debt. No change was made to the Code Blue policy but none of the physicians felt they could continue to express their concerns for patient safety caused by the policy.

"Punitive damages may be proven by circumstantial evidence and there is no requirement of direct evidence of intentional misconduct as most employment discrimination cases are inherently fact-based and necessarily rely on inferences rather than direct evidence." *Mignone,* 546 S.W.3d at 41. "The same evidence supporting the discrimination claim can also support a claim for punitive damages." *Id*. at 42. Through Dr. McHugh, KS-I and MO-I terminated the employment of Dr. Brovont in Kansas and Missouri, respectively, in retaliation for his complaints about patient safety with regard to

44

the Overland Park Code Blue policy, which complaints they knew were valid, and they did so for financial benefit.

**Conclusion**

KS-I and MO-I's Point V is denied.

**KS-I and MO-I's Point VI – Reduction of Punitive Damages**

In their sixth point, KS-I and MO-I alleged that the trial court erred in not reducing the total punitive damages award to $5 million, the maximum amount permitted under Kansas law to be assessed against a single entity.

The jury found that both KS-I and MO-I were liable for punitive damages and awarded $10 million against each defendant. The trial court treated the jury's awards as advisory under Rule 73.01 and, applying Kansas law (KAN. STAT. ANN. § 60-3702(e)), entered judgment punitive damages in favor of Dr. Brovont and against KS-I in the amount of $5 million and against MO-I in the amount of $5 million.

KS-I and MO-I argue that the trial court should have treated them as a single entity for liability purposes and entered a single punitive damages award. However, that was not reflected in the proposed judgment they submitted to the trial court:

> 4. Pursuant to K.S.A. § 60-3702 (b), the Court shall determine the amount of punitive damages to be awarded. Because Plaintiff is contesting the Court's application of Kansas law to his claims, the Court submitted the amount of the punitive damages award to the jury on an advisory basis. However, pursuant to the substantive limits on punitive damages set forth in K.S.A. § 60-3702 (e), the total recovery of Plaintiff Brovont for punitive damages against Defendant KS-I Medical Services, P.A., cannot exceed $5,000,000.00. After consideration of the factors set forth in K.S.A. § 60-3702 (b), the Court awards punitive damages against Defendant KS-I Medical Services, P.A. in the amount of _____.

45

5. Pursuant to the substantive limits on punitive damages set forth in K.S.A. § 60- 3702 (e), the total recovery of Plaintiff Brovont for punitive damages against Defendant MO-I Medical Services, LLC, also cannot exceed $5,000,000.00.  After considering the factors set forth in K.S.A. § 60-3702 the Court awards punitive damages against Defendant MO-I Medical Services, LLC, in the amount of _____.

In their suggestions to the trial court in support of their proposed judgment, KS-I and MO-I argued:

Pursuant to substantive Kansas damages caps, the amount of punitive damages cannot exceed $5 million against each Defendant in any event.  However, Defendants would argue that, after conducting a proceeding in which the statutory factors are considered with respect to each Defendant, the Court should enter an award much lower than the statutory caps – perhaps even a nominal amount, given the complete lack of evidence of willful, wanton, malicious or fraudulent conduct by either Defendant, but especially on the part of Defendant MO-I.  *Alternatively, if the Court, over Defendants' objection, chooses not to analyze the conduct of MO-I and KS-I separately and elects to treat the two entities essentially as one for the purposes of awarding punitive damages,* then only one statutory cap should apply, such that the judgment for punitive damages cannot exceed a total of $5 million in all.  If the Court chooses to apply two separate caps, it must truly assess the separate conduct of each Defendant in this action according to the Kansas statutory factors in order to determine the appropriate amounts of each award.

(emphasis added).  They asked the trial court "to determine an appropriate amount of punitive damages to be awarded against each Defendant, and then enter a Judgment in the form that Defendants have proposed contemporaneously herewith, applying the relevant Kansas damages caps."

In their motion to alter or amend the judgment, KS-I and MO-I asked the trial court to vacate the award for punitive damages and hold a hearing required by Kansas law for such an award to be made.  They asserted that:

46

Because MO-I and KS-I are separate entities, they are entitled to present evidence to the Court on each of these factors to demonstrate why they are not liable for punitive damages or should be held liable in a lesser amount and, further, to present evidence that each of them is not liable for the actions of the other entity.

In their suggestions in support, they argued that the court should enter a punitive damage award much lower than the statutory caps, "given the complete lack of evidence of willful, wanton, malicious or fraudulent conduct by either Defendant, but especially on the part of Defendant MO-I." Alternatively, they argued that:

> if the Court chooses not to analyze the conduct of MO-I and KS-I separately and elects to treat the two entities and their respective roles and conduct as essentially the same for the purposes of awarding punitive damages (as the jury appears to have done in its advisory opinion), then only one statutory cap should apply, such that the judgment for punitive damages cannot exceed a total of $5 million.

The trial court did exactly what KS-I and MO-I asked it to do. The court heard the evidence and arguments on punitive damages, analyzed the conduct of KS-I and MO-I separately, and determined the amount of punitive damages to be awarded against each pursuant to KAN. STAT. ANN. § 60-3702.

**Conclusion**

KS-I and MO-I's Point VI is denied.

**Rule 84.14 Amendments to the Judgment**

The trial court's judgment should be affirmed in part, reversed in part, and modified according to this court's rulings. Rule 84.14 directs this court to "give such judgment as the court ought to give" and, "[u]nless justice otherwise requires," to "dispose finally of the case." Accordingly, because the trial court erred in reducing the jury's non-economic

47

damages and in reducing the amount of punitive damages against MO-I, the judgment

should be modified pursuant to this court's authority under Rule 84.14 as follows:

1. Reverse that portion of the trial court's judgment for non-economic damages in favor of Dr. Brovont and against KS-I and MO-I, jointly and severally, in the amount of $300,000, and reinstate the jury's verdict in the amount $6 million;

2. Reverse the punitive damages award in favor of Dr. Brovont and against MO-I in the amount of $5 million, and reinstate the jury's verdict in the amount of $10 million;

3. As so modified, we affirm the trial court's judgment in all other respects.

_____
Gary D. Witt, Judge

All concur